TITUS G. DAY ET AL., EXECUTORS, *vs.* LAVINIA DAVIS.

*Conveyance of Mortgaged Property to Mortgagee—Right of Redemption—Agreement by Grantee to Recovery.*

When a mortgagor conveys the mortgaged property to the mortgagee by a deed absolute in form, the right of redemption will not be extinguished unless it appear that no advantage was taken of the necessities of the mortgagor and that the absolute conveyance was his voluntary act.

If a mortgagee agrees, in consideration of his mortgagor's conveying the property to him by a deed absolute in form, that the latter may buy it within a certain time at a designated price, such agreement has the same effect as if the mortgagee had agreed that the mortgagor might redeem the property on the terms mentioned.

After the maturity of a mortgage debt the mortgagor conveyed the land mortgaged to the mortgagee by an absolute deed and the mortgagee then signed a paper agreeing to rent the land to the mortgagor's son and giving an option to buy the land within one year at a fixed price.

Afterwards the parties made another agreement as to the rent, and the mortgagee-grantee agreed that "if he wants to sell said farm" he would give the mortgagor the refusal to buy it at the same fixed price. Upon a bill by the mortgagor to enforce a reconveyance of the property upon the payment of the amount due under the mortgage, *held*, upon the facts of the case that the mortgagor is entitled to redeem the property and that the agreements made at the time of the conveyance preserved this right; and the evidence is examined to ascertain the exact amount due to the mortgagee.

Appeal from the Circuit Court for Frederick County (Mc-Sherry, C. J., and Motter, J.)

The cause was argued before Fowler, Briscoe, Page, Boyd, Pearce, Schmucker and Jones, JJ.

*William P. Maulsby* (with whom was *Frank C. Norwood* on the brief), for the appellants.

*Milton G. Urner* and *Milton G. Urner, Jr.,* (with whom was *Hammond Urner* on the brief), for the appellee.

Boyd, J., delivered the opinion of the Court.

The bill in this case was filed by the appellee against Rufus K. Day, who died while the case was pending in the lower Court, and the appellants, who are his executors, together with his widow and heirs at law, were made parties. The object of the bill was to require Mr. Day to reconvey to the appellee a tract of land situated in Montgomery County upon the payment of the amount to be ascertained by an accounting, which is also prayed to be had. On July 25th, 1893, Mrs. Davis executed a mortgage to Mr. Day to secure the sum of $3,000, borrowed by her from him. In 1897 she conveyed the property to Mr. Day by a deed which is absolute on its face for the consideration of $3,000, as stated in the deed, but shown to have been $5,000, but she claims that she had a right to redeem the property on payment of the latter sum with interest, and she alleges her readiness to pay it, or so much as may be found to be due, or to bring it into Court. The decree of the lower Court declared that the deed was in fact a

mortgage, determined that the amount due was $4,375.05, and appointed a trustee to reconvey the property upon her bringing said sum into Court within sixty days. She paid that sum into Court, and the appellants took this appeal from the decree.

On March 11th, 1897, there was due on the mortgage the whole of the principal, and $652 interest—being in all the sum of $3,652. On that date Mr. Day and the appellee, her two sons and a son-in-law, met to adjust the matter and it was then found that Mrs. Davis owed Mr. Day $4,125, and he agreed to pay her in cash, or give his note with security satisfactory to her for $875, upon her delivery of a deed for the property. During the following month she delivered the deed which is dated the 17th of April, 1897. On March 11th Mr. Day also signed an agreement filed with the bill as "Exhibit No. 3," which is as follows:

March 11, 1897.

I hereby agree to rent to Ebert Davis the farm now occupied by him on the half-and-half basis for the year ending March 31, 1898. He is hereby given an option to continue the rental of same for another year. Option is also given him to buy within one year from date the farm at the price paid by me provided he pays me expenses on same to date of sale, notice of intended purchase must be made by Jan. 1, '98, and payment of $1,000 at that time.

Rufus K. Day.

On the 26th of April, 1897, he and Mrs. Davis entered into another agreement which the appellee contends was signed by her by reason of threats and representations made by Mr. Day; and the effect of that instrument, together with some statements made in it, becomes very material in the consideration of the case. The amount due, in the event of the right of the appellee to redeem being established, is also in controversy. The witnesses for the respective parties differ as to the value of the property, but without discussing that, it may be safely assumed that it is in fact regarded by the parties to this cause to be worth more than $5,000, as otherwise this litigation would seem to be useless. For although there is now some controversy about the amount due, there does not

appear to have been any difference between Mrs. Davis and Mr. Day on that question before this proceeding was commenced, and she seems to have been willing to have accepted his figures as to that when she sought to redeem the property—at any rate his refusal to allow her to redeem was not put on that ground.

It will be observed that "Exhibit No. 3" copied above, shows that Mr. Day agreed to rent the farm to Ebert Davis, a son of the appellee, and the option was given to him. It is therefore earnestly contended by the appellants that if the agreement of April 26th be declared invalid, the appellee can have no standing in Court as her son, and not Mrs. Davis, has whatever rights that paper gives. But the testimony, as well as the conduct of Mr. Day, shows conclusively that while the right was nominally given to the son, it was intended and was so understood by all concerned, to be for the benefit of Mrs. Davis. Mr. Day, in answer to the question whether it was not agreed that he was to take the farm at $5,000, pay Mrs. Davis the estimated difference of $875, and that he would rent the farm to Ebert with the privilege mentioned in "Exhibit No. 3," replied "I never rented him the farm. She rented it." He then explained that Mrs. Davis and her son William rented it, and the latter agreed to bind himself to pay the difference between the "half-and-half" basis, provided for by "Exhibit No. 3," and the $300 per annum and the taxes. If Mr. Day's statement of that renting was correct, how can he or those claiming through him, contend that Ebert alone was to have the benefit of the option given in that exhibit ? If it be true that notwithstanding the plain language of that paper, in which it is said that Mr. Day agreed to rent the farm to Ebert, in reality Mrs. Davis and not Mr. Day rented it to him, why should Mrs. Davis be excluded from all interest in the option therein given? She and her son Ebert lived together on the farm, and the bills for fertilizers which were deducted out of the $5,000 were against him as well as his mother. Mr. William Davis, who is a clergyman, and represented his mother for the most part at the interview of March

11th, testified that there was a distinct understanding that *either his mother or Ebert* should have the right "to redeem the place at the $5,000, plus the cost on the same." Mrs. Davis so understood it, but beyond all that, and what ought at least in a Court of equity to be conclusive of it, in the agreement of April 26th, which was drawn by Mr. Day, it is stated that "the said Lavinia Davis had rented the said farm to her son Ebert S. Davis for one-half of the crop raised on the farm, the rent commencing on the 11th day of March, 1897, and to and on the 11th day of March, 1898." It authorizes Mr. Day to withhold $200 of Mrs. Davis' money until the 11th day of March, 1898, to apply to the rent if he does not receive $300 and taxes, and then provides that "the said Rufus K. Day if he wants to sell said farm agrees to give the said Lavinia Davis the refusal to buy said farm at the price he asks for it or five thousand dollars." If it was not understood by all concerned that the right given in the name of Ebert on March 11th was in fact intended to be for the benefit of Mrs. Davis, how could Mr. Day justify his act on April 26th when he gave Mrs. Davis the refusal to buy, in the absence of Ebert and so far as the record discloses without obtaining his consent? It seems perfectly clear, therefore, that whatever right to redeem, re-purchase, or whatever it may be called, was given by the paper of March 11th, was intended to be and was for the benefit of Mrs. Davis, who was the sole owner of the property prior to that date, and hence that paper cannot stand in her way.

The record is too voluminous to attempt to cite all of the statements of witnesses, or to quote from the various letters and documents in it on the subject, and we must confine ourselves to some of the more important evidence reflecting upon the question whether the appellee did have the right to redeem. It may be well to remark in passing that we do not deem it necessary, in order to reach a proper conclusion, to ascertain from the record whether the parties connected with this controversy used the term "redeem" in their conversations, letters or documents. The word has a meaning when

used concerning mortgagors and mortgagees that is well understood by lawyers, and they would probably invariably use it in connection with a question such as that now before us, but this valuable right, created by Courts of equity, cannot be lost or taken away by reason merely of the use of some other word. A mortgagor will not be deprived of it when he has surrendered the property to the mortgagee merely because he reserved the right to "buy" or "repurchase" and did not speak of it as a right to "redeem." Just as Courts of equity, having regard for the substance of the transaction rather than its form, gave the privilege to mortgagors to redeem after a forfeiture, so should they not permit that valuable right to be frittered away because the one entitled to it was not versed in the terms ordinarily applied to such transactions. If a mortgagee agrees, in consideration of his mortgagor conveying the property to him by a deed absolute on its face, that the latter can *buy* it within a certain time, at a fixed price, how does it in effect differ from his agreeing that he may *redeem* it in that time, and at that price?

The quotations above made from the agreement of April 26th, go very far to show that Mr. Day thoroughly understood that Mrs. Davis' rights in the property were not to be entirely surrendered by the deed made by her. He received the deed from her in April, but did not file it for record until December 8th, 1897. That of course is not conclusive, but it is a circumstance of much weight—especially as in November, 1897, Mrs. Davis went to him to redeem the property. In the testimony of Mr. Day are the following questions and answers: "(Q.) She was to have the right to redeem it at $5,000 wasn't she? Ans. She was to have it, provided she would take it, but I offered it to her but she never would take it, she told me to see her son. (Q.) When did she tell you to see her son? Ans. She told me sometime along after April, after the things were signed. (Q.) Which son? Ans. It was Ebert. (Q.) Well, she did come in November, 1897, and told you she would take it, didn't she? Ans. I reckon it was in November. (Q.) And she wanted to redeem it? Ans. Yes·

and I told her she couldn't redeem it for I wouldn't sell it."
On November 1st, 1897, he had written her a letter which
she says she did not get until the Monday night after the
election. In it he said he had told her she had the refusal
of the farm, and she told him she did not want to buy it; that
"I had a man to see me last Saturday and offered five thou-
sand dollars cash for it, and I told him I would write to you,
and if you did not take it at that price I would let him know
next Saturday"—again "So if you want it at that price your
money is as good as his, and I want you to send me word
immediately if you are going to take it or not, if I see fit to
sell it at that price." She swore that she went to see Mr.
Day the day after she received that letter and told him she
intended to keep the farm, and he would have to give her time
to get the money; that he said he could not do that as he had
promised to let Mr. Riggs know by a certain time. She said
"I asked him what was the use of his giving me the refusal
if now he refused to give me time to raise him the money; he
said he would give me three days, and in that time I should
notify Mr. Riggs, which I did." She also said that the third
day she and her son went to see Mr. Day and he told her Mr.
Riggs was to come up that day and pay him $100 to bind the
bargain. She told him he had $200 of her money, that he
could keep that to bind the bargain, and he said that she had
stopped the sale and now neither could have it, and he in-
tended to rent it to Mr. Riggs. Mr. Day denied that he had
told her she could have three days to raise the money, but it
is clear that he recognized her right to buy the farm, although
he was dealing with Mr. Riggs, and that he was asking him
$6,000. He told Mrs. Davis that Mr. Riggs had offered "to
split the difference and give him $5,500."

It must not be forgotten that when these parties met on
March 11th, Mr. Day agreed that the property could be re-
purchased within one year from that date at the price paid by
him ($5,000) "provided he pays me expenses on same to date
of sale, notice of intended purchase must be made by January
1st, 1898, and payment of $1,000 at that time," which we

have already said was for the benefit of Mrs. Davis. The presumption is, and there would seem to be no room to doubt, that that agreement on the part of the mortgagee was *an*, if not *the*, inducement which caused the mortgagor to deed her property to him, and after she had executed the deed in accordance with the agreement made at that time, and was ready to deliver it, such an agreement as that of April 26th, made in the absence of her son who had conducted the previous negotiations for her, and of any other adviser, should be received by a Court of equity with great caution, if at all. It must at least be construed very strictly against the mortgagee. There can be no doubt from the evidence, even that of Mr. Day himself, that Mrs. Davis did in November—more than a month before January 1st, 1898—notify him that she would repurchase the property, and as he then positively refused to allow her to do so, it becomes of little importance whether she was *at that time* prepared to pay the money or any part of it. There is at least sufficient in the record to show that she might have been able to raise the money by the time the agreement of March 11th required it to be paid. But if we give the agreement of April 26th all the effect that could reasonably be claimed for it—where it undertakes to limit the refusal to buy given to Mrs. Davis by the expression "if he wants to sell said farm"— it is impossible to escape the conclusion that Mr. Day was not dealing fairly and in such way as a Court of equity should require a mortgagee to deal with a mortgagor. The only fair construction that can be placed on the letter of November 1st, quoted from above, is that he did want to sell the farm and that he had a purchaser who would take it if she did not. That person was Mr. Riggs, as Mr. Day afterwards told Mrs. Davis, yet we find this in his testimony. "(Q.) Were you about to sell it to Mr. Riggs? Ans. No sir. (Q.) Do you mean that you had no idea of selling it to Mr. Riggs at that time? Ans. That's what I mean." And after giving an utterly unsatisfactory explanation of what he meant by the letter of November 1st, when asked whether Mrs. Davis went at any time to tell him she wanted the place, he replied "She come

after the election.  I wrote her the same week election was, and she come on Thursday, I think it was.  *I sent her word I wanted to sell the property, and to come down to see me.*"  Then when she did go and told him that she was to have the farm when she wanted it, he referred her to the agreement of April 26th, and told her it provided that "if I wanted to sell my place, I would give her the refusal of it, but I did not want to sell it at that time."

Although Mr. Day denied that such was *his* understanding, there can be no doubt that Mrs. Davis thought she had the right to redeem the property when she signed the agreement of April 26th.  She testified that when he read that paper she told him she would not sign it, and she wanted to see her son William before she did, and Mr. Day said he would sell the farm and foreclose the mortgage, and she added "that scared me; I didn't know what he could do; I told him then that he should put in there that I should have the refusal of the farm at the same price that he was allowing me for it; he said he would do so, and wrote something in. the agreement; he didn't read to me what he had written, but told me it was all right as I wanted it; then showed me where to sign my name, and I signed."  Titus G. Day, the son of Rufus K., who witnessed the agreement, testified that his father read the agreement and he "followed him in the copy.  Mrs. Davis asked father if he wouldn't make a change in the agreement, instead of it reading, 'he would sell the farm to her at any time at his price.'  She asked him to change it to read that he would sell it to her for what he gave for it, and he put that change in the agreement; after this was done, they both, Mrs. Davis and my father, signed these papers and they were witnessed by me."  In view of that testimony there can be no doubt that Mrs. Davis not only believed, but had the right to believe, that the agreement had been so worded as to give her the privilege to repurchase the property and by the very terms of the agreement it was a "refusal to buy said farm at the price he asks for it, or five thousand dollars."  If we place the construction on the agreement contended for by the appellants

that Mr. Day only bound himself to sell to Mrs. Davis if he
wanted to sell the farm, it cannot be denied that if he did want
to sell it he could only require Mrs. Davis to pay $5,000, and
when we find from the record that he was endeavoring to get
more from Mr. Riggs, and probably could have done so, it is
difficult to explain his conduct on any other theory than that
he was attempting to get rid of Mrs. Davis' option, and when
she notified him that she would take the property he then re-
lied on the clause which he had written in the agreement—
"if he wants to sell said farm"—and told her he did not want
to sell, although in his letter written a few days before he had
so clearly indicated his willingness to sell.

We have already referred to the fact that the deed was not
recorded until December 8th, 1897. Mr. Day testified that
after it was delivered to him he tried to persuade Ebert to
take the property, that he told him if he gave him $1,700 in
money he would let him stay on the place until he made
enough to pay the other $300, and added that he said to
Ebert "I will trust you for that amount of money until you
make it off the place, and you can only pay me the interest, but
I don't want you to pay any of the money at all outside the in-
terest unless you choose to do it, *and I will burn the deed and
not get it recorded.* Then I had the deed recorded after I
found they wouldn't do nothing." If it was understood that
the deed satisfied the mortgage, and Mrs. Davis no longer
had any interest in the property, excepting a mere privilege to
repurchase it if Mr. Day wanted to sell it, how could he sell
the property to Ebert subject to the mortgage? It is true the
mortgage was not released on the records, even when the tes-
timony was taken, but if it was in fact *paid*, by what authority
was he going to revive it—make it a subsisting mortgage?
There is a covenant in it for the mortgagor to pay the debt
secured thereby, and interest, as well as all taxes, but without
considering any possible liability on the part of Mrs. Davis in
the event of a subsequent depreciation of the property, it is
difficult to reconcile the proposition of Mr. Day to Ebert with
any theory other than that his understanding was that Mrs.

Davis had the right to redeem the property, that his dealings with Ebert were to be for her benefit, and he was withholding the deed from record to see if she, or Ebert for her, did redeem the property within the year.    It is clear that his statement that he had the deed recorded after he found they would do nothing was not true, because he admitted that Mrs. Davis did notify him in November of her intention to redeem it, and he did not record the deed until December 8th.

Other circumstances might be referred to, such as the fact that he rented the farm to Ebert for $300 (6 per cent interest on the $5,000) and taxes, but we do not deem it necessary. The principles governing dealings between mortgagors and mortgagees have often been announced by this Court.    In *Baugher* v. *Merryman*, 32 Md. 191, JUDGE ALVEY said : "The relation of mortgagor and mortgagee existing between these parties at the time of the execution of the absolute deed in question, causes the Court to view with distrust, and to scrutinize with closeness, the negotiation that led to the making of that deed, whereby it is now claimed that the right of redemption has been extinguished, and the previous mortgage converted into an absolute sale.    To sustain such a transaction as a sale, without the right of redemption, it requires that all the circumstances attending it shall be perfectly fair and free from the least taint of advantage or imposition taken, or practiced by the mortgagee."    And he thus referred to *Conway* v. *Alexander*, 7 Cranch, 218, as to the policy of the law: "*For, as was said by that learned Court, lenders of money being less under the pressure of circumstances which control the perfect and free exercise of the judgment than borrowers, the effort is frequently made by that class of persons to avail themselves of the advantage of this superiority in order to obtain ineqitable bargains; and, for this reason, the leaning of the Courts is against them, and doubtful cases have generally been decided to be mortgages.*"    And again he quoted from *Dougherty* v. *McColgan*, 6 G. & J. 275, that "where the relation of mortgagor and mortgagee is once fairly established, though the equity of redemption may be sold or disposed of to the mortgagee; yet,

unless the transaction appears to be fair, and unmixed with any advantage taken by the mortgagee of the necessitous circumstances of the mortgagor, equity will hold the parties to their original relation of debtor and creditor." Other cases might be cited but these general principles are so well settled that we do not deem it necessary to do so. Applying them to this case we are of the opinion that the appellee was entitled to redeem this property. At the time the agreement to convey the property by a deed was made, the principal and interest of the mortgage amounted to $3,652, and Mrs. Davis had also made herself responsible to Mr. Day for other money. She was confronted with the fact that she was either to have her property sold under the mortgage, or convey it. It must be conceded that Mr. Day had the undoubted right to demand payment of the mortgage, and that he had been lenient with her as to the payment of the interest, but Mrs. Davis was undoubtedly induced to convey the property to him by reason of her "necessitous circumstances," and the promise to allow her, or her son in her interest, to repurchase the property. After that agreement had been made, when she had the counsel and advice of her son, it was not in accord with such principles as have been stated above, when Mr. Day demanded of her the execution of the agreement of April 26th, under the circumstances shown by this record. She then had confidence in him, and could easily be induced to accept his statement as true. She unquestionably believed when she signed that agreement that he had given her the right to redeem the property at $5,000, and her evidence, as well as that of Titus G. Day, shows that when Mr. Day changed the agreement at her request, she was justified in believing he had done what she asked him to do, and had not qualified her right to redeem by making it subject to his desire to sell. She was ignorant in business matters, and although she might have seen the clause in question in the agreement, if she had read it, which she says she did not do, she probably would not have comprehended its real object or meaning, and when he gave her to understand he had changed it

as she requested, he should not afterwards be permitted to take advantage of the clause which it is now claimed in effect destroyed the value of the right to redeem given her. But if it be given effect, we think the record sufficently shows that he had determined to sell the farm, or at least said so, and then offered her "the refusal to buy" which he had no right to withdraw, and then rely upon this clause, which under the circumstances we have related was not only inequitable and giving him an undue advantage, but contrary to what he led her to believe he had inserted in the agreement  We are, therefore, of the opinion that the appellee had the right to redeem the property.

The remaining question to be considered is the amount to be paid by her.  The evidence conclusively shows that the statement in the agreement of April 26th, 1897, that Mr. Day had paid all of the $875 to Mrs. Davis, excepting the $200 was not correct, as he did not pay the Rev. W. W. Davis the sum of $300 until some time in May, and other payments claimed by him were apparently made after April 26th. The testimony is not very satisfactory as to how the $4,125 was made up, beyond the mortgage and interest.  Mr. Day testified that nothing entered into that amount excepting the mortgage and open accounts for fertilizers, with interest. He at first produced a memorandum which he said he had taken from his books, which consisted of three items amounting to $412.45, and added that a balance on a note of $196, which was given for fertilizers, was included.  He was unable to state what the balance was, but there is a difference of $60.55 between the amount of the mortgage and fertilizer bills, and the $4,125 allowed in the settlement.  Whether or not compound interest was charged is at least doubtful, and as Mr. Day and Rev. W. W. Davis, who was acting for his mother, agreed upon the $4,125 as correct, we will assume that was made up by the balance of the $196 note as testified to by Mr. Day.

So far as the transaction spoken of as the Linthicum sale is concerned, it seems to be reasonably certain that that was not

settled on March 11th.    In the first place what we have stated above shows the items that entered into that settlement, according to Mr. Day's own testimony, but he testified that the Linthicum note was still in his possession, and only $100 had been paid on it, which he claimed to have paid to his son Titus.    He ought to have credited the balance on the fertilizer account, but the accounts themselves filed by him show that he did not.    There is, therefore, at least $300 with interest due on that transaction.    Mrs. Davis testified that he accepted the $400 to be applied to the open account.    It is not shown just what was done with the account amounting with interest to $153.19 against "Mr. Ebert Davis and mother," but when Mr. Day first testified concerning the fertilizer accounts, he did not claim that against Mrs. Davis, but filed a statement of what she owed amounting to the sum of $412.45.    The evidence is too uncertain as to that to allow it against the Linthicum transaction.    The Court below allowed credits on the $875, amounting to $578.60.    Included in those is the Titus Day note of $51.    Mr. Day testified that his son allowed a credit of five or six dollars on that, but we do not think that note should be charged against Mrs. Davis, as she was not legally or morally bound to pay it.    We think the proper credits to be allowed are as follows: Amount paid Rev. W. W. Davis, $300; Mobley note, $162.31; paid Mrs. Davis, April 26th, 1897, $20; sent her by registered letter, $25; sent her by George Merson, $20, and the note of $38, less five dollars credited, amounting in all to $560.31.    The amount would then stand as follows :

| | |
|---|---|
| Amount retained by Mr. Day | $875.00 |
| Paid out by him | 560.31 |
| | |
| Balance | $314.69 |
| Principal due on Linthicum transaction | 300.00 |
| | |
| Total due by Mr. Day, exclusive of interest | $614.69 |

When we deduct that sum from the $5,000 there remains $4,385.31.    The decree below required Mrs. Davis to pay into Court $4,357.05, leaving an apparent difference between

the amount fixed by us and that allowed by the decreee of
$28.26. But inasmuch as the Linthicum transaction was in
April, 1896, interest on that sum and on the balance of $875
would amount to much more than that difference, and hence
we will not disturb the decree, as the appellee is not com-
plaining of it. Mr. Day charged Mrs. Davis with interest on
the fertilizer accounts, amounting to much more than the dif-
ference of $28.26, and it would have been proper to allow her in-
terest. Mr. Day and the appellants have had the income from
the farm since March 11th, 1897, and therefore no further in-
terest is to be added against Mrs. Davis. The appellants con-
tend that at least part of the $200 should be retained as they
claim that Ebert did not pay all the rent. Just what he did
pay is somewhat doubtful, but he and Mr. Day made a new
agreement on September 1st, 1897, to which Mrs. Davis was
in no wise a party, and there is too much uncertainty about
the transaction to justify the Court in allowing any portion of
that sum. We will therefore affirm the decree.

> *Decree affirmed, the appellants to pay
> the costs.*

(Decided June 20th, 1905.)