721 A.2d 249

**MONTGOMERY COUNTY, Maryland**

v.

**MAY DEPARTMENT STORES COMPANY.**

**No. 19, Sept. Term, 1998.**

Court of Appeals of Maryland.

Dec. 14, 1998.

Charles W. Thompson, Jr., County Attorney (Karen L. Federman Henry, Principal Counsel for Appeals, on brief), Rockville, for petitioner.

Kenneth B. Tecler, Rockville, counsel for Housing Opportunities Commission of Montgomery County, for Amicus Curiae.

Ronald S. Canter (Ronald M. Abramson, Wolpoff & Abramson, L.L.P., all on brief), Bethseda, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, RAKER and WILNER, JJ., and ROBERT L. KARWACKI, Judge (retired), Specially Assigned).

RODOWSKY, Judge.

This dispute is between claimants to surplus funds in a mortgage foreclosure. The petitioner, Montgomery County, Maryland (the County), rests its claim on Montgomery County Code (1994) (MCC), Chapter 25A, as amended. The claim of respondent, May Department Stores Co. d/b/a Woodward & Lothrop, Inc. (the Store), is based on a judgment lien. The Court of Special Appeals held in favor of the Store. *May Dep't Stores v. Montgomery County*, 118 Md.App. 441, 702

A.2d 988 (1997). We granted the County's petition for certiorari, and we shall affirm for the reasons explained below.[1]

## I

MCC Chapter 25A governs the County's Moderately Priced Dwelling Unit (MPDU) program. One feature of the County's effort to meet the need for affordable housing authorizes an increase in the zoning density of a residential real estate development if the developer includes MPDUs. § 25A–5.[2] The ordinance requires there to be an agreement between the developer and the County, and that recorded covenants be imposed by the developer on the MPDU lots. § 25A–5(k). These covenants "run with the land for the entire period of control," § 25A–5(k)(1), and they "bind the applicant [*i.e.*, the developer], any assignee, mortgagee, or buyer, and all other parties that receive title to the property. These covenants must be senior to all instruments securing permanent financing." § 25A–5(k)(2). The period of control for MPDUs built for sale, as contrasted with those built for rental, is ten years from the date of initial sale. § 25A–3(g).

The ordinance also sets forth rules on maximum sale and resale prices and addresses foreclosure and judicial sales of MPDUs. When such a unit is sold by a developer to the first grantee, there is a maximum selling price established by the County Executive. § 25A–7(a). The maximum price for resale of an MPDU within the control period is fixed in accordance with § 25A–9(a), which in relevant part reads:

> "(a) *Resale price and terms.* Except for foreclosure proceedings, any MPDU constructed or offered for sale ... under this Chapter must not be resold during the

---

1. After the decision in the Court of Special Appeals and before argument in this Court, a second judgment lienor, Avenel Community Association, Inc., which had been an appellant before the Court of Special Appeals, settled with the County.

2. All references to Chapter 25A are to the Montgomery County Code (1994) as amended.

control period for a price greater than the original selling price plus:

"(1) A percentage of the unit's original selling price equal to the increase in the cost of living since the unit was first sold, as determined by the Consumer Price Index;

"(2) The fair market value of improvements made to the unit between the date of original sale and the date of resale;

"(3) An allowance for closing costs which were not paid by the initial seller, but which will be paid by the initial buyer for the benefit of the later buyer; and

"(4) A reasonable sales commission if the unit is not sold during the priority marketing period to an eligible person from the [County's] eligibility list."

Before any MPDU may be offered for resale during the control period, it "must first be offered exclusively for 60 days" to the Montgomery County Department of Housing and Community Affairs (the Department). §§ 25A–9(b)(1); 25A–3(j). If there is no resale of an MPDU during the control period, then, on the first sale of the unit after the control period ends, "the seller must pay to the Housing Initiative Fund one-half of the excess of the total resale price over" a maximum price computed under the ordinance. § 25A–9(c)(1). The Housing Initiative Fund (the Fund) is one "established by the County Executive to achieve the purposes of Section 25B–9" of MCC. § 25A–3(n).[3]

---

3. Chapter 25B of MCC sets forth the County's affordable housing policy and includes provisions governing the County's Closing Cost Assistance Program, §§ 25B–10 through 25B–16, and Productivity Housing Program, §§ 25B–17 through 25B–22. Chapter 25B mandates the establishment of the Montgomery Housing Initiative "to promote a broad range of housing opportunities in the county." § 25B–9(a). Funds allocated to the Montgomery Housing Initiative may be spent to:

"(1) Construct or acquire affordable housing units;
"(2) Buy and rehabilitate existing rental units that would otherwise be removed from the supply of affordable housing; and

The matter now before us involves the foreclosure sale of an MPDU during the control period when the unit was held by the original grantee from the developer. The relevant section of the ordinance is § 25A–9(e), which in pertinent part reads:

*"Foreclosure or other court-ordered sales.* If an MPDU is sold through a foreclosure or other court-ordered sale, a payment must be made to the Housing Initiative Fund as follows:

"(1) If the sale occurs during the first 10 years after the original sale or rental, any amount of the foreclosure sale price which exceeds the total of the approved resale price under subsection (a), reasonable foreclosure costs, and liens filed under the Maryland Contract Lien Act [Maryland Code (1974, 1996 Repl.Vol., 1998 Cum.Supp.), §§ 14–201 through 14–206 of the Real Property Article], must be paid to the Housing Initiative Fund. If the remaining balance under the original first deed of trust or mortgage exceeds the resale price under subsection (a), then the difference between the foreclosure sales price and the balance of the original first deed of trust (plus reasonable foreclosure costs) must be paid to the Fund.

. . . .

"(4) If the MPDU is sold subject to senior liens, the lien balances must be included in calculating the sale price.

"All MPDU covenants must be released after the required payment is made into the Housing Initiative Fund."

---

"(3) Participate in housing or mixed-use developments that will include affordable housing."
§ 25B–9(c).

The Productivity Housing Program is designed "to promote the construction of housing affordable to households with incomes at and below the area-wide median income level," and is intended to complement the MPDU program under Chapter 25A. § 25B–18(b), (c). This program, similar to the MPDU program, includes rules on maximum sale and resale prices and addresses foreclosure and judicial sales of affordable "productivity" housing. § 25B–21.

Montgomery County first enacted an MPDU ordinance in 1974. *See* Montgomery County Code (1972, 1976 Cum.Supp.), ch. 25A. By Chapter 564 of the Acts of 1991, the Maryland General Assembly specifically authorized local governments to develop and administer affordable housing programs which include restrictions and regulations on the sale and purchase of those properties. *See* Md.Code (1957, 1995 Repl.Vol.), Art. 66B, "Zoning and Planning," § 12.01.[4]

## II

In May 1992 Rock Run Limited Partnership (RRLP), the developer of the Avenel Subdivision, recorded a declaration of covenants in compliance with the MPDU program. The declaration covers sixty lots in Avenel, which are therein called "The Property," including Lot 140, 9742 Pleasant Gate Lane, Potomac, Maryland 20854, the lot involved in the case before us. Article II of the declaration provides:

"For a period of ten years beginning on the date of recordation of the first deed from the Declarant or such other period as established by law, The Property and the improvements hereon and those that may subsequently be made to The Property must not be sold for an amount in excess of the maximum sales price established by written regulation of the County Executive from time to time and in accordance with Chapter 25A of the Montgomery County

---

**4.** Article 66B, § 12.01 provides:

"(a) *Ordinances or laws authorized.*—To promote the creation of housing that is affordable to persons and families who have low or moderate incomes, the legislative body of a county or municipal corporation, including Baltimore City, that exercises authority granted by this article may enact ordinances or other laws that:

"(1) Impose inclusionary zoning and award density bonuses to create affordable housing units; and

"(2) Impose restrictions on the use, cost, and resale of housing that is created under this subtitle to ensure that the purposes of this subtitle are carried out.

"(b) *Authority additional.*—The authority under this subtitle is in addition to any existing zoning and planning powers."

Code, 1984, as amended, and any appropriate Executive Regulations."

Article X of the declaration, the only article that specifically addresses foreclosure sales, reads in relevant part:

"If The Property is sold at a foreclosure sale, the restrictions contained in the Covenants will be terminated after the County has received the payment required to be made to the Housing Initiative Fund in accordance with the provisions of Section 25A–9(e) ... after which the provisions of these Covenants will terminate."

Furthermore, in the declaration RRLP irrevocably assigned to the County enforcement rights under the covenants, which require that the original and all subsequent deeds contain conspicuous language reciting that the property is subject to the recorded covenants.

In November 1992 RRLP conveyed Lot 140 by deed to Deborah Farr (Farr) "in fee simple" for $99,078. The conveyance was expressly subject to the declaration of covenants. Farr financed the purchase by a loan from a lender designated by the Montgomery County Housing Opportunities Commission (HOC) in the amount of $94,100. That loan was secured by a deed of trust.

In September 1994 the Store obtained a judgment against Farr in the District Court of Maryland sitting in Montgomery County in the amount of $3,918.33. In October 1994 the notice of lien of this judgment, pursuant to Maryland Rule 3–621(c), was recorded in the Circuit Court for Montgomery County.

Farr defaulted on her note secured by the deed of trust in 1995. HOC acquired the note, substituted trustees, and, in July 1996, instituted foreclosure. While the foreclosure sale was pending the County notified the trustees that Lot 140 was subject to recorded covenants and that the current controlled resale price of the property was $105,121. At the foreclosure sale in August 1996 Lot 140 brought $147,000.

This sale was ratified, and the matter was referred to an auditor to state an account. The Store filed a claim, and the

auditor considered that the County had filed a claim to the entire surplus. The auditor's report reflected credits of $148,-858.50, representing the foreclosure sale price plus interest to the settlement date, and debits of $119,875.36, representing a statement of mortgage debt, with interest, of $108,761.12, costs of sale of $10,750.07, and a tax adjustment of $364.17. This resulted in a surplus of $28,983.14. The auditor was "unable from the Court file to determine the priority of payment and recommend[ed] that the Trustees, under appropriate Order, pay same into the Registry of the Court," pending hearing before the circuit court.

The County excepted to the auditor's report and moved for payment of the excess proceeds into the Fund. In an affidavit in support of the motion, the County recalculated the approved resale price from approximately $105,121 ($96,725 original purchase price plus 8.68% CPI adjustment) to $105,352.87 ($96,725 original purchase price plus 8.92% CPI adjustment) to reflect the higher CPI rate in August 1996.

The circuit court disallowed the Store's claim and ordered that the entire surplus be paid to the Fund. Because the Store's judgment lien had been recorded after the declaration of covenants, which the court concluded ran with the land, the court held that the judgment lien was subject to the provisions of § 25A-9(e). Agreeing with a further argument by the County, the circuit court held that "liens" in § 25A-9(e)(4) ("If the MPDU is sold subject to senior liens, the lien balances must be included in calculating the sale price.") referred only to primary mortgages and first deeds of trust, and not to judgment liens. The Store also claimed that the ordinance violated equal protection because there was no rational basis for distinguishing in § 25A-9(e)(1) between its judgment lien and a lien filed under the Maryland Contract Lien Act. This argument was rejected by the circuit court on the ground that the public interest in affordable housing furnished a rational basis for the distinction.

▆▆▆ On appeal the Court of Special Appeals, correctly in our view, analyzed the issue as one of priority of liens against

the realty. *May Dep't Stores,* 118 Md.App. 441, 702 A.2d 988. The court stated that the Store held a valid judgment lien against Farr's property prior to foreclosure. Under Maryland Code (1974, 1996 Repl.Vol., 1998 Cum.Supp.), § 7–104 of the Real Property Article, only a purchase money mortgage or deed of trust or, in some instances, an instrument securing future advances, takes priority over a prior recorded and indexed judgment lien. *May Dep't Stores,* 118 Md.App. at 451, 702 A.2d at 993. Thus, if a property owner of an unmortgaged property incurs a new indebtedness secured by a mortgage on the property, *i.e.,* a first mortgage, that first (non-purchase money) mortgage is inferior to any prior re-corded judgment lien; the first mortgage would be junior to the senior, recorded judgment lien. *Id.* at 451–52, 702 A.2d at 994.

The court reviewed the statutory history of judgment lien priorities, *id.* at 452–58, 702 A.2d at 994–97, and concluded that "[a]s far as we can determine, the County never had a judgment lien against the property." *Id.* at 458, 702 A.2d at 997. The County may have had a cause of action against Farr based on the covenant, but it would not have been entitled to the foreclosure proceeds even if there were no judgment creditors.

"One generally cannot, during the post-ratification and audit stages of a foreclosure action, assert what is essentially a cause of action to obtain the surplus from the foreclosure sale. Normally, proceedings based upon the alleged cause of action are necessary to achieve judgment creditor status and, through that status, priority."

*Id.*

Further, held the court, the covenants were contractual obligations which, absent statutory provision, do not achieve automatic priority in a foreclosure proceeding. *Id.* The court ruled that the County cannot change by ordinance the order of priorities created by public general laws, the Maryland Rules of Procedure and Maryland cases respecting a judgment lien

holder's claim to the surplus proceeds of a foreclosure sale. *Id.* at 460, 702 A.2d at 998.

We granted the County's petition for certiorari which raises a single question, namely:

"Whether the provision of the Montgomery County Code that implements State-granted authority to create affordable housing conforms with State law defining the priority of liens."

In its argument in support of the petition the County argued that the covenant established a lien without further action, that the Store's lien was junior and extinguished in the foreclosure, and that there was no preemption because the provisions of Chapter 25A are authorized by State law. In its brief in this Court the County for the first time additionally presents an alternative argument, namely, that the County acquired a property interest in Lot 140 that was not reached by the Store's judgment lien.

Before turning to our analysis, it should be noted that the dispute in this case is between the County, which claims all of the surplus, and the Store, which seeks to have its judgment lien paid out of the surplus. Thus, we need not decide whether Farr has any interest in the surplus. Nor are we concerned with whether the covenants would run with the land and bind assignees of Farr or bind the purchaser at the mortgage foreclosure sale.

### III

The covenants did not create a lien on Lot 140. A lien is " 'a right given by contract, statute, or rule of law to have a debt or charge satisfied out of a particular property.' " *Chevy Chase Bank, FSB v. Chaires,* 350 Md. 716, 731, 715 A.2d 199, 206 (1998) (quoting 3 American Law of Property § 13.20, at 537 n. 4 (A.J. Casner ed.1952)). *See also Westinghouse Elec. Corp. v. State Tax Comm'n,* 206 Md. 392, 402, 111 A.2d 661, 666 (1955) ("A lien is merely a charge upon the thing as security for a debt.").

Article II of the declaration of covenants states that Lot 140 "must not be sold for an amount in excess of the maximum sales price established by written regulation of the County Executive ... and in accordance with Chapter 25A...." There is no language by which grantees of MPDUs in Avenel agree to the imposition of a lien on their particular lot. Further, it is far from clear that Article II even applies to the instant matter, inasmuch as Article II may be read as limited to voluntary sales. Foreclosure sales are addressed in Article X of the covenant. It states simply that in the event of a foreclosure sale "the Covenants will be terminated after the County has received the payment required to be made" to the Fund under § 25A–9(e). In Article X the use of the passive voice muddles where any obligation lies, but presumably it would be on the covenantor, in this case Farr. In any event Article X contains no language contractually imposing a lien on the property for any amount payable under § 25A–9(e).

■ Nor does § 25A–9(e) create a statutory lien. There is no language expressly imposing a lien in that section. Once again, the section speaks in the passive voice: the computed sum "must be paid to the Housing Initiative Fund." § 25A–9(e)(1). In this subsection, as under the covenants, the obligation presumably is on the covenantor.

■ Inclusion in a contract of language expressly creating a lien is not an absolute prerequisite to the recognition of a lien in equity. In *Keyworth v. Israelson*, 240 Md. 289, 214 A.2d 168 (1965), we said:

> "An equitable lien is based on specific enforcement of a contract to assign property as security. The contract need not stipulate for the lien in express terms; it is enough if that is the fair and reasonable implication of the terms employed. A mere promise to pay a debt or obligation does not of itself, however, create a lien unless the intention to create it is apparent from the instrument and circumstances leading to it. *Johnson v. Johnson*, 40 Md. 189, 196 (1874). See 33 Am.Jur. *Liens* § 18 and 4 Pomeroy's *Equity Juris-*

*prudence* §§ 1235–1237 (5th ed.1941); but also see 41 Harv. L.Rev. 404 (1928)."

*Id.* at 305, 214 A.2d at 177.

A negative covenant was involved in *Equitable Trust Co. v. Imbesi*, 287 Md. 249, 412 A.2d 96 (1980). There, in connection with a loan from a bank, the borrower promised the bank in a notarized and recorded instrument that the borrower would not encumber or convey certain real estate owned by him so long as he was indebted to the bank. The bank sought to foreclose on the land, asserting that the covenant created an equitable mortgage, but we rejected that argument. Quoting favorably from 2 G. Gilmore, *Security Interests in Personal Property* § 38.4, at 1017 (1965), we said:

" 'Nothing is to be gained by giving a shadowy effectiveness to informal arrangements which conform to no recognized pattern. The debtor's covenant not to encumber property, like the contractor's covenant not to assign moneys to become due under his contract, should be treated, as on the whole the case law has done, as a covenant "merely personal"—good enough to give rights against the covenantor for breach, to bring an acceleration clause into play, to constitute an "event of default" under a loan agreement, but not good enough to give rights, whether they be called legal or equitable, in property.' "

*Equitable Trust,* 287 Md. at 270, 412 A.2d at 106.

In the matter before us Article X of the Avenel MPDU covenants is even further removed from an equitable lien than was the covenant not to encumber or convey that was involved in *Equitable Trust.*

That a lien in favor of the County should not be implied into § 25A–9(e)(1) is evidenced by the subsection's computation of the amount to be paid to the County, as contrasted with the actual foreclosure sale surplus, computed conventionally, available for distribution. Section 25A–9(e)(1) states the rules for determining the amount to be paid to the Fund on mortgage foreclosure and other court-ordered sales. The § 25A–9(e)(1) formula for determining the payment to the Fund when there

has been a mortgage foreclosure or other court-ordered sale contains five factors: (1) the mortgage foreclosure sale price (in this case, $148,858.50); (2) the total of the subsection (a) approved resale price ($105,352.87) plus foreclosure costs ($10,750.07) plus any Maryland Contract Lien Act liens ($0), which total we shall call the "Control Price" ($116,102.94); (3) the mortgage balance ($108,761.12); (4) the mortgage balance plus foreclosure costs ($119,511.19); and (5) the subsection (a) approved resale price ($105,352.87). Where the mortgage foreclosure sale price is greater than the Control Price, the difference is the amount to be paid to the Fund. Under this formula in the instant matter $32,755.56 would be payable to the Fund ($148,858.50 minus $116,102.94). The alternate computation under § 25A–9(e)(1) also applies here because the mortgage balance is greater than the subsection (a) approved resale price. Under these circumstances the alternate formula under § 25A–9(e)(1) calls for subtracting the total of the mortgage balance ($108,761.12) plus the foreclosure costs ($10,750.07), that is, $119,511.19, from the foreclosure sale price ($148,858.50). Under the alternate computation $29,-347.31 would be payable to the Fund. We need not decide in the instant matter which calculation is applicable. That is a matter between Farr and the County.

 Of significance here is that both computations exceed the foreclosure sale surplus, if it is computed in accordance with conventional rules of law, and without deducting any amount in payment of the Store's judgment lien. The actual foreclosure sale surplus, as reported by the auditor without accounting for judgment liens, is $28,983.14.[5] Also significant is that the § 25A–9(e)(1) alternate computation has no factor for any lien other than the original first mortgage. If the foreclosure is initiated by a junior lienor, senior liens are

---

5. Section 25A–9(e)(1) calculates the amount to be paid to the Fund based on the gross foreclosure sale price. In this case, the auditor calculated the foreclosure sale surplus based on the net foreclosure sale price after adjusting for Farr's tax liability until the date of the foreclosure sale. Section 25A–9(e)(1) does not account for this factor.

taken into account in the formula only in determining the foreclosure sale price.[6]

In sum, subsection (e)(1) calculates the extent of a covenantor's liability independently of the surplus reported by the auditor, applying general legal principles, and the subsection does not address the priority of liens. Subsection (e)(1) in effect states the liability imposed by the County on the person who has enjoyed the use of the MPDU without having paid market value—a liability that is at least a partial recoupment of the benefit conferred. That liability is not limited by the actual foreclosure sale surplus, conventionally computed. The liability is based on a personal covenant. Chapter 25A does not impose a lien on the realty or a charge, per se, on the sale proceeds into which the realty has been converted.[7]

## IV

Inasmuch as the County has neither a contractual nor a statutory lien upon Lot 140, the County is a general creditor in the distribution of the mortgage sale proceeds and is

---

**6.** Contrary to the opinion of the circuit court, we hold that "senior liens" and "lien balances" as used in § 25A–9(e)(4) include judgment as well as mortgage liens. This is clear from the introduction to subsection (e) which defines the scope of the subsection to include foreclosures and "other court-ordered sale[s]."

Furthermore, as stated by the Court of Special Appeals, senior status is not reserved solely for first mortgages.

"In judgment lien priority law, senior status relates to the order of judgment lien priority. If one's judgment lien is recorded after four other judgment liens, those four prior judgment liens are *all* senior to the fifth judgment lien. The first of the four liens docketed would be the most senior. Each of the others would be junior to the other more senior lien, but itself senior to any judgment lien later recorded."

*May Dep't Stores*, 118 Md.App. at 462, 702 A.2d at 999.

**7.** Farr had notice of the mortgage foreclosure, but she has not contested the County's assertion that the foreclosure sale surplus is to be applied to her liability to the County under the covenant and under the ordinance. We do not in this case decide whether, procedurally, Farr was obliged to oppose the County's exceptions to the auditor's report in order to have the surplus distributed to her, or whether the Store's opposition to the County's exceptions inures to Farr's benefit, at least to the extent of stating the account. These matters are open on remand.

subject to the priority of the Store's judgment lien. If we assume, *arguendo*, that as a matter of statutory construction, § 25A–9(e) attempted to effect a reordering of priorities between judgment lienors and the County, as a general creditor under the MPDU program, then the attempt would be invalid. Under those circumstances § 25A–9(e) would be preempted by conflict with public general statutory law, for the reasons stated by the Court of Special Appeals. *May Dep't Stores,* 118 Md.App. at 448–63, 702 A.2d at 992–99.

In this Court the County challenges that conclusion, contending that Maryland Code (1957, 1995 Repl.Vol.), Article 66B, § 12.01 authorizes lien priority for counties and municipal corporations that adopt "inclusionary zoning" ordinances. Section 12.01(a)(2) states that those governmental bodies may "[i]mpose restrictions on the use, cost, and resale of housing that is created under this subtitle to ensure that the purposes of this subtitle are carried out." [8]

We shall assume, as did the Court of Special Appeals, that the term "resale" in § 12.01(a)(2) is not limited to voluntary sales, but that it can, depending upon the circumstances, include involuntary sales. In the instant matter the "resale" was effected by the mortgage foreclosure and not by a judicial sale under the lien of the Store's judgment. The language on which the County necessarily relies cannot be stretched to produce the result the County seeks. If § 12.01 included a grant of power to reorder priorities in connection with the distribution of the proceeds of an involuntary sale, then the County could place its general creditor-MPDU claim ahead of a lien in favor of the Comptroller of the Treasury. While § 12.01 authorizes the County to enact restrictions on the resale of affordable housing, the statute cannot be read so broadly as to grant to the County the authority to reorder the

---

**8.** Article 66B, § 7.03(a) states that, with the exception of certain sections, including §§ 12.01 and 13.01 of Article 66B, "and subject to subsection (b) of this section, this article does not apply to the chartered counties of Maryland." Subsection (b) of § 7.03 makes § 13.01 inapplicable to Montgomery and Prince George's Counties.

priorities for payment of surplus proceeds from a mortgage foreclosure sale contrary to State statutory law.

## V

 The County also contends that Farr's acquisition of Lot 140, subject to the covenants, created a legally recognized property interest in the County. This argument, made for the first time in the County's brief in this Court, is an obvious effort to circumvent the County's inability to convert the MPDU covenants into a lien that would be subject only to the original first mortgage. We shall exercise our discretion under Maryland Rule 8–131(b)(1) to consider this question because of the public importance of the issue, which is likely to recur, and for the guidance of the trial court on remand.

The County cites no judicial precedent or discussion by a legal commentator that recognizes and identifies the property interest that the County claims, and we have found no such authority. The theory of the County seems to be that the effect of the declaration of covenants on the fee simple grant from the developer to Farr was to sever from her bundle of rights her equity of redemption, at least to the extent of a liability that might arise in the future to pay an amount calculable under § 25A–9(e).[9]

Under the County's newcomer theory the lien of the Store's judgment against Farr does not reach the County's purportedly separate property interest. Under this theory the County does not depend on having a "senior" lien which extinguishes

---

**9.** The origin of the equity of redemption is described in H. Ginsberg & I. Ginsberg, *Mortgages and Other Liens in Maryland* 278 (1936).

"Under the old common law, a mortgage was regarded, as it still is at law today, as an absolute conveyance of the legal title, subject to a defeasance clause allowing the mortgagor to terminate the conveyance by paying the amount stipulated to be paid on the day it was due. If the debt was not paid on the day it fell due, the mortgagee could compel a forfeiture of the entire estate to himself. Realizing the harsh position of the mortgagor, equity, at an early date intervened and allowed the mortgagor to come in and redeem the property within a reasonable time after forfeiture."

(Footnote omitted).

the Store's "junior" lien when the sale proceeds are exhausted in payment of the County's lien.

Conveyances by a mortgagor of the equity of redemption may, under proper circumstances, be made to the mortgagee, as in the case of deeds in lieu of foreclosure. Such transfers are closely scrutinized to protect the equity of redemption from overreaching by the creditor. *Day v. Davis,* 101 Md. 259, 269–70, 61 A. 576, 580 (1905). Further, where the owner of property encumbered by a mortgage conveys the property to a third party to the mortgagor-mortgagee relationship, and that third party takes subject to the mortgage or assumes payment of the mortgage, there will be a transfer of the equity of redemption. But, here, the County does not claim by grant.

*Kretzer v. Lorshbaugh,* 117 Md. 562, 83 A. 1027 (1912), is somewhat instructive in that it deals with a promise by an owner for valuable consideration to transfer real property that was subject to a mortgage to a third party to the mortgagor-mortgagee relationship. Promisor and promisee were respectively an unmarried woman and man living together. He loaned her $100 toward purchase of a house, and she borrowed $300 elsewhere, secured by a mortgage, toward the purchase. In a written memorandum signed by the woman, she promised to repay the $100 to the man, together with unspecified but calculable sums expended by the man on improvements to the property. The woman further promised that in the event of her death the house would become the absolute property of the man. The woman died intestate without having satisfied the debt to the man, and the house devolved upon her heirs at law. The mortgage was foreclosed, producing a surplus, which represented the remnant or residual value of the equity of redemption. We held that the agreement between the man and the woman "operate[d] as a good equitable assignment of the fund representing the equity of redemption." *Id.* at 568, 83 A. at 1029. Consequently, the heirs at law held the fund in trust for the man.

In that case we quoted the following passage from *Holmes v. Evans,* 129 N.Y. 140, 29 N.E. 233 (1891).

" 'An equitable assignment has been defined to be such an assignment as gives the assignee a title which, although not cognizable at law, equity will recognize and protect. Such an assignment passes an immediate equitable interest in the subject, although it is not essential to the creation of the interest that it should be immediately enforceable by suit for specific performance to recover the interest assigned. . . . There must undoubtedly be a purpose to pass a present interest, but that interest may be absolute or qualified, a right to the immediate possession and enjoyment, or a right to such enjoyment postponed until the occurrence of some future event. In other words, the assignment may be made subject to limitations, conditions and qualifications, such as might be inserted in the conveyance or assignment of the legal estate in the same subject.' "

129 N.Y. at 144–45, 29 N.E. at 233–34 (quoted in *Kretzer,* 117 Md. at 568–69, 83 A. at 1029).

In the matter now before us Farr did not covenant that she would grant (or devise) her property, subject to the mortgage, to the County. There is, therefore, nothing for equity to enforce by equitable assignment.

We hold that the County's interest in having Farr pay her obligation under the declaration of covenants is not a right or estate in land, but it is a chose in action. *Compare Union Trust Co. v. Biggs,* 153 Md. 50, 55, 57, 137 A. 509, 512 (1927) (mortgage foreclosure sale "divested all rights of redemption which had remained in the mortgagor until the sale"; consequently, a creditor's post-sale judgment effected no "right or estate in land but a chose in action").

**JUDGMENT OF THE COURT OF SPECIAL APPEALS MODIFIED AND, AS MODIFIED, AFFIRMED. PROCEEDINGS ON REMAND IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY SHALL BE IN ACCORDANCE WITH THIS OPINION. COSTS TO BE PAID BY PETITIONER, MONTGOMERY COUNTY, MARYLAND.**