768 A.2d 639

**June PENCE**

v.

**NORWEST BANK MINNESOTA, N.A., Trustee, et al.**

**No. 74, Sept. Term, 2000.**

Court of Appeals of Maryland.

March 8, 2001.

Debra Gardner (Laurie Norris of Public Justice Center; David Walsh-Little and St. Ambrose Legal Services, on brief), Baltimore, for petitioner/cross-respondent.

Joseph B. Espo (Brown, Goldstein & Levy, LLP, on brief), Baltimore, for respondents/cross-petitioners.

Elizabeth Renuart, National Consumer Law Center, Boston, MA, brief of amicus curiae National Consumer Law Center in support of petitioner/cross-respondent.

Thurman W. Zollicoffer, Jr., City Solicitor, William R. Phelan, Jr., Principal Counsel, Dept. of Law, Baltimore, brief of Mayor and City Council of Baltimore, amicus curiae, filed on behalf of petitioner.

Argued before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

CATHELL, Judge.

On September 29, 1997, June L. Pence, petitioner, filed a complaint in the Circuit Court for Baltimore City against Maryland Financial Resources, Inc. (hereinafter Maryland Financial), Access Financial (hereinafter Access), Norwest Bank Minnesota (hereinafter Norwest), LSI Financial Group (hereinafter LSI Financial), First Security Savings Bank (hereinafter First Security),[1] and Michael Fine.[2] In the complaint, petitioner alleged that the defendants violated Maryland's Secondary Mortgage Loan Law (SMLL), codified at Maryland Code (1975, 2000 Repl.Vol.), Title 12, Subtitle 4 of the Commercial Law Article.[3]

On August 13, 1998, petitioner filed a Motion for Summary Judgment in the Circuit Court for Baltimore City. This motion was granted by the Circuit Court. Respondents filed a Motion to Alter or Amend Judgment, which was denied by the Circuit Court. Respondents then filed a Notice of Appeal to the Court of Special Appeals.

In an opinion filed on June 2, 2000, the Court of Special Appeals reversed the decision of the Circuit Court for Baltimore City in *Norwest Bank Minnesota, N.A., Trustee v.*

---

**1.** After the filing of petitioner's Complaint, First Security changed its name to Flagstar Bank, FSB. We will refer to the bank as First Security.

**2.** Michael Fine and First Security were eventually dismissed from the suit. On May 7, 1998, petitioner filed an Amended Complaint against the only parties that were then left in the suit, Maryland Financial, Access, and Norwest. On September 9, 1998, petitioner filed a Second Amended Complaint that brought Ocwen Federal Bank, FSB into the suit. The only parties that were defendants in the original complaint that are involved in this appeal are Norwest and Access, respondents.

**3.** The Complaint was filed in 1997 when the Maryland Secondary Mortgage Law was codified at Maryland Code (1975, 1990 Repl.Vol.) Title 12, Subtitle 4 of the Commercial Law Article. All references to the Maryland Secondary Mortgage Law are to the 2000 Replacement Volume except where cited because of a change in the statute from the 1990 Replacement Volume to the 2000 Replacement Volume.

*Pence,* 132 Md.App. 363, 752 A.2d 681 (2000). Petitioner filed a Petition for Writ of Certiorari and respondents filed a Reply and Conditional Cross–Petition. We granted both petitions.[4] Two questions were presented to this Court:

1.  Did the Court of Special Appeals err in holding that a Baltimore City Deferred Loan (for housing rehabilitation) does not subject the real property to "the lien of [a] prior encumbrance" under the Maryland Secondary Mortgage Loan Law?

2.  Can a federal savings bank that purchases a loan originated by a Maryland finance company claim broad federal preemption of the Maryland Secondary Mortgage Loan Law?[5] [Alteration in original.]

We answer question one in the negative and therefore affirm the decision of the Court of Special Appeals. We hold that the Court of Special Appeals properly held that the agreement between petitioner and the City of Baltimore was not a lien of a prior encumbrance under the provisions of the Maryland Secondary Mortgage Loan Law. Because we are affirming the decision of the Court of Special Appeals in favor of respondents, we need not to address question two, presented in respondent's Conditional Cross–Petition.

### Facts

Ms. Pence resides at 1231 Anglesea Street in Baltimore City. In October of 1984, Ms. Pence needed repairs done to her house. She entered into a Baltimore City Deferred Loan Agreement (hereinafter City Loan) with the Mayor and City Council of Baltimore for a loan of $6,265.00.[6] Ms. Pence had a water leak stopped, new shingles and rain drains installed, her ceiling fixed, and had repairs made to her front porch. The

---

4.  The Mayor and City Council of Baltimore and the National Consumer Law Center filed amicus curiae briefs in support of petitioner.

5.  This question was not presented by petitioner, but was presented by respondents in their Conditional Cross–Petition.

6.  The Baltimore City Deferred Loan Program provides low-interest loans to enable qualified low-income homeowners to perform repairs

loan was recorded in the land records of Baltimore City on December 21, 1984.[7] Ms. Pence testified that she believed that she was giving Baltimore City a lien on her property.

In October of 1991, Ms. Pence and her daughter, Barbara Johnson Jacobs, entered into a mortgage agreement with Banker's First Mortgage for $30,002.55. On September 30, 1994, Ms. Pence and Ms. Jacobs then refinanced this loan with First Security for $38,500.00 (hereinafter Bank Loan). The Bank Loan originated with Maryland Financial pursuant to a Correspondent Agreement between First Security and Maryland Financial. At the time of settlement on the Bank Loan, Maryland Financial took a Deed of Trust on Ms. Pence's property as security for the loan. Maryland Financial then assigned this Deed of Trust to First Security. During the processing of the Bank Loan, Advance Title Services completed an abstract or title search and Valley Title Company completed a title examination. At the time of the Bank Loan, Ms. Pence owed approximately $6,265.00 on the City Loan.

Ms. Pence made her monthly payments on the Bank Loan until she became disabled in September of 1996. Her income was then limited to federal disability benefits and she was not able to make her payments on the Bank Loan.[8] Ms. Pence

---

and rehabilitation work on their houses. The loans are available to make repairs to necessities such as plumbing, heating, and structural safety. The homeowner agrees to subject the property to a "rehabilitation easement," which grants access to the City to make sure that the loan is used to make repairs to the home in compliance with the Baltimore City Deferred Loan Agreement. Under the standard loan agreement, the homeowner is not required to make any payment on the loan and the simple interest at the rate of 3% per annum unless "the Property is transferred, sold, assigned or abandoned or if the Owner ceases to own the Property, whether by death [unless the owner's heirs are eligible to assume the loan], condemnation, operation of Law or otherwise."

7. The City Loan was titled "Baltimore City Deferred Loan Agreement." The backing attached to the Agreement indicated that it was a "Mortgage."

8. Ms. Pence started to receive disability benefits in February of 1997. She received $279.00 a month in Social Security Disability Insurance

was then informed by LSI Financial that her property would be the subject of a foreclosure action if she did not make all of the payments that were due on the Bank Loan.

### Procedural History

On September 29, 1997, Ms. Pence filed a Complaint in the Circuit Court for Baltimore City. She brought suit against Maryland Financial, First Security, Access, Michael Fine, Norwest, and LSI Financial,[9] claiming that they had violated the Maryland Secondary Mortgage Loan Law.[10] Ms. Pence alleged that the City Loan was a lien on her property, bringing all of the defendants within the purview of Maryland's Secondary Mortgage Loan Law. Ms. Pence further alleged that the defendants, violated Maryland's Secondary Mortgage Loan Law, by increasing her finance charge, her annual percentage rate, and her monthly payments on the loan. Ms. Pence requested that the court order that the defendants could only collect the principal amount of the loan, asked the court to assess statutory damages as treble damages, and asked that the court enjoin LSI Financial from pursuing foreclosure against her property pending the adjudication of her claims.

On January 12, 1998, Access, LSI Financial, and Norwest filed a Motion to Dismiss, for Summary Judgment or to

---

and $225.00 a month in Supplemental Security Income from the Social Security Administration. Ms. Pence's payment on the Bank Loan was $384.94 a month.

9. Maryland Financial was the original lender of the loan at issue in the case *sub judice*. Maryland Financial assigned the loan to First Security. LSI Financial serviced the loan on an assignment from First Security. Access eventually became the owner of the loan, which was part of a package of securitized loans. Norwest was an assignee of Access and was a trustee of the securitized loan pool in which Ms. Pence's loan was held. Ocwen eventually replaced LSI Financial as the servicer of the loan. Michael Fine was a trustee set forth in the deed of trust.

10. It is argued that, if applicable under the SMLL, the interest rate charged and the loan origination fee would be in violation of the statute.

Strike. In their motion, they alleged that the City Loan to Ms. Pence was not a lien as is required by the Maryland Secondary Mortgage Loan Law, therefore, the Secondary Mortgage Loan Law is not applicable to this case. They also alleged that LSI Financial has no interest in the debt and the outcome of this case. The motion also contended that Ms. Pence had "unclean hands." They alleged that at the time of the settlement on the second loan, Ms. Pence committed to removing any prior liens from the property she was refinancing. They contend that Ms. Pence cannot use the City Loan as both a shield and a sword.

On January 22, 1998, First Security filed a Motion for Summary Judgment incorporating the motion and supporting authorities of the motion filed by Access, LSI Financial, and Norwest. On January 26, 1998, Maryland Financial filed a Motion for Summary Judgment, also incorporating the motion and supporting authorities filed by Access, LSI Financial, and Norwest.

On January 30, 1998, Ms. Pence filed a Response to Defendants' Motion to Dismiss, for Summary Judgment or to Strike. In her response, Ms. Pence claimed that the City Loan was a lien that made the Maryland Secondary Mortgage Loan Law applicable to the loan between Ms. Pence and the defendants to her suit.

On March 19, 1998, the Circuit Court for Baltimore City denied the Motion to Dismiss, for Summary Judgment or to Strike of Access, LSI Financial, and Norwest. The Circuit Court also denied the Motions for Summary Judgment of First Security and Maryland Financial. The Circuit Court found that the City Loan was a lien that brought the Maryland Secondary Mortgage Loan Law into play. The Circuit Court stated that:

The court is persuaded that the 1984 agreement [City Loan] was a lien of a prior encumbrance. There is no requirement in the Act that a classic mortgage exist. Therefore, there is no necessity of finding some conditional conveyance of an estate, subject to repayment of the loan.

A rehabilitation easement is an encumbrance on the property in that it subjects the owner and subsequent purchasers to a particular rehabilitation obligation presently and *in futuro*. It is a lien because it burdens the property to that extent, reveals its intended purpose by calling itself a "mortgage" and alerts both future lenders and future purchasers by public recordation. Further, although there is nothing in the record to reveal legislative intent, it is fairly inferable from the portion of the text of the Act in question here, which was unamended in the final text of the Bill, that the General Assembly intended to protect those who were already under some loan obligation affecting the property when they negotiated subsequent loans which would also affect and burden that same property. This case presents that very circumstance. Because the defendants were all on notice of the first agreement and its encumbrance on the property, this result cannot work an undue hardship on them. [Footnotes omitted.]

The Circuit Court then found that Ms. Pence did not have "unclean hands." The City Loan had been recorded in the land records of Baltimore City and the Deed of Trust between Ms. Pence and the lenders stated that "the property is unencumbered, except for encumbrances of record." The Circuit Court held that Ms. Pence did not have to remove the City Loan because it was an encumbrance of record that was exempted by the Deed of Trust.

On January 20, 1998, a Stipulation of Dismissal was filed, dismissing Michael Fine from the suit. On April 24, 1998, a Stipulation of Dismissal was filed, dismissing First Security from the action. On May 7, 1998, Ms. Pence filed an Amended Complaint against Maryland Financial, Access, and Norwest, but deleting LSI Financial from the suit. The Amended Complaint made the same allegation that there was a violation of the Maryland Secondary Mortgage Loan Law.

On August 13, 1998, Ms. Pence filed a Motion for Summary Judgment. In her motion, Ms. Pence alleged that the Circuit Court had already found that the City Loan was a prior lien making the defendants in her suit in violation of the Maryland

Secondary Mortgage Loan Law as a matter of law. Therefore, in accordance with Maryland Code (1975, 1990 Repl.Vol.), section 12–413 of the Commercial Law Article, the lenders should only be able to collect the principal amount of the loan and may not collect interest, costs or other charges with respect to the loan.[11] Respondents filed a Response to the Motion for Summary Judgment on August 28, 1998. In their Response, respondents contended that the motion should be denied because (1) the relief sought by petitioner goes well beyond what is called for in the note or the statute at issue, (2) the State secondary mortgage law is preempted by federal regulations, and (3) petitioner did not reveal to her lenders and loan originators that her house was allegedly encumbered by a previous loan.

On September 9, 1998, Ms. Pence filed a Second Amended Complaint. This complaint added Ocwen to the suit. Ms. Pence alleged that Ocwen was the current servicer of the mortgage loan, which encompasses the right to collect mortgage payments. Ms. Pence included Ocwen in the suit for the purpose of requesting the court to enjoin any collection activity or foreclosure proceedings that Ocwen may pursue.

On December 11, 1998, the Circuit Court for Baltimore City granted Ms. Pence's Motion for Summary Judgment. The Circuit Court found that the lenders had violated the Maryland Secondary Mortgage Loan Law as a matter of law. The Circuit Court cited the earlier decision of the court to deny the lenders' Motion for Summary Judgment and found that the decision implicitly, if not expressly, found that the lenders had violated the Maryland Secondary Mortgage Loan Law and

---

11. Maryland Code (1975, 1990 Repl.Vol.), section 12–413 of the Commercial Law Article states that:

§ 12–413. Civil Penalties.

Except for a bona fide error of computation, if a lender violates any provision of this subtitle he may collect only the principal amount of the loan and may not collect any interest, costs, or other charges with respect to the loan. In addition, a lender who knowingly violates any provision of this subtitle also shall forfeit to the borrower three times the amount of interest and charges collected in excess of that authorized by law.

that Ms. Pence was entitled to the penalties permitted by section 12–413. The Circuit Court cited the earlier opinion of that Court that stated:

> [P]laintiff will be entitled to the relief she has won in this proceeding, i.e., that "Defendants may only collect the principal amount of the loan [less amounts paid by plaintiff on that principal] and shall not collect interest, costs or other charges with respect to this loan." In addition, plaintiff will be entitled to offset against the principal indebtedness statutory damages in such amount as may be proven by her to her entitlement under the Act. [Alteration in original.]

The Circuit Court also found that Ms. Pence was not in default on the Bank Loan and was entitled to a revised amortization schedule, that federal preemption is not in effect in this case, and that Ms. Pence was solicited by Maryland Financial for the Bank Loan so Ms. Pence is not estopped from bringing this suit.

On January 13, 1999, the Circuit Court for Baltimore City signed an Order that clarified the status of the Bank Loan based upon the Court's granting petitioner's Motion for Summary Judgment. The Order stated that:

> **ORDERED** that the current balance of the loan is **$23,198.29,** based on the following itemization of partial payments & overpayments:

> Ms. Pence made payments in the amount of $384.94 for twenty-four months for a total amount of **$9,238.56.** Ms. Pence also paid settlement charges in the amount of **$6,063.15.**

> $9,238.56 + $6,063.15 = **$15,301.71.** This amount is to be subtracted from the total loan amount. $38,500.00–$15,301.71 = **$23,198.29;** and it is further

> **ORDERED** that no interest or fees will be charged in connection with this loan through its maturity in November, 2024; and it is further

> **ORDERED** that the attached revised amortization schedule shall govern this loan through its maturity.

On January 21, 1999, Access and Norwest filed a Motion to Alter or Amend the Judgment. On February 17, 1999, Ocwen filed a Motion to Alter or Amend Judgment that incorporated the motion filed by Access and Norwest. The court denied both of these motions.

On June 4, 1999, Norwest and Access filed a Notice of Appeal to the Court of Special Appeals. In *Norwest Bank Minnesota, N.A. Trustee v. Pence,* 132 Md.App. 363, 752 A.2d 681 (2000), the Court of Special Appeals reversed the Circuit Court for Baltimore City, holding that the Circuit Court erred when it found that the City Loan was the type of a lien of prior encumbrance that triggered the restrictions of the Maryland Secondary Mortgage Loan Act. The Court of Special Appeals stated that:

> To be sure, we recognize that it is not necessary for the agreement to contain the word "lien" in order to create an equitable lien. "The modern conception of a lien is that it is a right given by contract, statute or rule of law to have a debt or charge satisfied out of a particular property." *Chaires,* 350 Md. at 731, 715 A.2d 199 (quoting 3 Am. Law of Property § 1320, at 537 n. 4 (A.J. Casner ed.1952)). We are not convinced, however, that the parties intended for 1231 Anglesea Street to serve as security for the City loan. In the first place, Ms. Pence did not convey the property to the City as security for repayment of the loan, nor does the agreement provide for a power of sale, authorizing the City to sell the property upon Ms. Pence's default. In fact, it is far from clear what the City's recourse would be if the City loan were ever in default, or even if default could occur. In Ms. Pence's agreement with the City, the agreement provides that the City could "take whatever action at Law [sic] or in equity as may appear necessary or desirable to enforce any obligation, covenant or agreement of the Owner under this Agreement." Under this provision, we assume that the City could file an action against Ms. Pence personally to satisfy the debt. "[I]t would appear that . . . for an equitable lien to exist a specific intent to create a lien must be made manifest. . . ." *Imbesi, supra* at 260, 412 A.2d 96.

This leads us to conclude that the City loan did not create a mortgage, nor did it create an equitable lien. It is not manifest from the agreement that the parties intended for 1231 Anglesea Street to serve as security for the City loan. *Id.* at 371–72, 752 A.2d at 685–86 (footnote omitted) (alterations in original). · Ms. Pence filed a Petition for Writ of Certiorari to this Court and respondents filed a Reply and Conditional Cross Petition for Writ of Certiorari.

## Discussion

We shall affirm the Court of Special Appeals and hold that the Baltimore City Deferred Loan was not the type of a lien of a prior encumbrance that triggered the restrictions of the Maryland Secondary Mortgage Loan Act. We will first examine the standard for reviewing the granting of a motion for summary judgment. We will then review the nature of mortgages and equitable mortgages.

### A. Summary Judgment

The trial court, in accordance with Maryland Rule 2–501(e), shall grant a motion for summary judgment "if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." In the case *sub judice,* the Circuit Court for Baltimore City determined that there was no dispute of material fact and that petitioner was entitled to judgment as a matter of law.

In reviewing the grant of a summary judgment motion, we are concerned with whether a dispute of material fact exists. *Williams v. Mayor & City Council of Baltimore,* 359 Md. 101, 113, 753 A.2d 41, 47 (2000); *Hartford Ins. Co. v. Manor Inn of Bethesda, Inc.,* 335 Md. 135, 144, 642 A.2d 219, 224 (1994); *Gross v. Sussex, Inc.,* 332 Md. 247, 255, 630 A.2d 1156, 1160 (1993); *Beatty v. Trailmaster Products, Inc.,* 330 Md. 726, 737, 625 A.2d 1005, 1011 (1993); *Arnold Developer, Inc. v. Collins,* 318 Md. 259, 262, 567 A.2d 949, 951 (1990); *Bachmann v. Glazer & Glazer, Inc.,* 316 Md. 405, 408, 559 A.2d 365, 366 (1989); *King v. Bankerd,* 303 Md. 98, 110–11,

492 A.2d 608, 614 (1985) (citations omitted). "A material fact is a fact the resolution of which will somehow affect the outcome of the case." *King,* 303 Md. at 111, 492 A.2d at 614 (*citing Lynx, Inc. v. Ordnance Prods., Inc.,* 273 Md. 1, 8, 327 A.2d 502, 509 (1974)). "[A] dispute as to facts relating to grounds upon which the decision is not rested is not a dispute with respect to a *material* fact and such dispute does not prevent the entry of summary judgment." *Salisbury Beauty Schs. v. State Bd. of Cosmetologists,* 268 Md. 32, 40, 300 A.2d 367, 374 (1973).

■ This Court also has stated that "[t]he standard of review for a grant of summary judgment is whether the trial court was legally correct." *Goodwich v. Sinai Hosp. of Baltimore, Inc.,* 343 Md. 185, 204, 680 A.2d 1067, 1076 (1996); *see also Murphy v. Merzbacher,* 346 Md. 525, 530–31, 697 A.2d 861, 864 (1997); *Hartford Ins. Co.,* 335 Md. at 144, 642 A.2d at 224; *Gross,* 332 Md. at 255, 630 A.2d at 1160; *Heat & Power Corp. v. Air Prods. & Chems., Inc.,* 320 Md. 584, 592, 578 A.2d 1202, 1206 (1990) (citations omitted). We stated specifically in *Beatty v. Trailmaster Products, Inc.,* 330 Md. 726, 737, 625 A.2d 1005, 1011 (1993) that "[i]t is thus clear that under Maryland's summary judgment rule, a trial court determines issues of law; it makes rulings as a matter of law, resolving no disputed issues of fact." In the present case, there are no disputes of relevant determinative facts. The issue is clearly a matter of law for this Court to determine.

### B. Mortgage

■ We next describe the nature of mortgages. In the case of *Equitable Trust Co. v. Imbesi,* 287 Md. 249, 412 A.2d 96 (1980), where this Court examined the characteristics of both a formal mortgage and an equitable mortgage, we stated that:

Equitable is of the view that the instrument here, "on its face, [is] precisely the type of agreement which creates an equitable lien or mortgage."

We start with the fact that this instrument by no stretch of the imagination can legitimately be called a mortgage and that it does not even purport to be in the form of a mortgage. In *Bank v. Lanahan*, 45 Md. 396 (1876), Judge Alvey set forth for the Court the characteristics of a mortgage:

> By the legal, formal mortgage, as distinguished from instruments held to be mortgages by construction of Courts of Equity, the property is conveyed or assigned by the mortgagor to the mortgagee, in form like that of an absolute legal conveyance, but subject to a proviso or condition by which the conveyance is to become void, or the estate is to be reconveyed, upon payment to the mortgagee of the principal sum secured, with interest, on a day certain; and upon nonperformance of this condition, the mortgagee's conditional estate becomes absolute at law, and he may take possession thereof, but it remains redeemable in equity during a certain period under the rules imposed by Courts of Equity, or by statute. [*Id.* at 407.]

It will be seen that this instrument has in it none of the requisites of a mortgage set forth for the Court by Judge Alvey in that case.

Equitable does not say that this is a proper mortgage, but suggests it is an equitable mortgage. Without exception, the instruments which we have held to be equitable mortgages have been ones which *on their face appeared to be mortgages* but which were defective in some manner. For instance, in *LeBrun v. Prosise*, 197 Md. 466, 477, 79 A.2d 543 (1951), Judge Markell quoted from *Dyson v. Simmons*, 48 Md. 207 (1878), where Judge Alvey said for the Court:

> The principle is now so well settled, that it would seem to be beyond all question and controversy, that if a party makes a mortgage, or affects to make one, but it proves to be defective, by reason of some informality or omission, such as failure to record in due time, defective acknowledgment, or the like, though even by the omission of the mortgagee himself, as the instrument is at least evidence

of an agreement to convey, the conscience of the mortgagor is bound, and it will be enforced by a court of equity. [*Id.* 48 Md. at 214.]

In *Dyson* the mortgage was recorded in Montgomery County where the land was situate, but the acknowledgment was taken before a justice of the peace in Frederick County. Our statute at the time required that if an acknowledgment were taken before a justice of the peace "out of the county ... wherein the real estate or any part of it lies," then "the official character of the justice [was required to be] certified to by the clerk of the circuit or superior court under his official seal." This certificate was missing.

*Id.* at 253–55, 412 A.2d at 98–99 (alterations in original) (emphasis added) (footnote omitted). The Baltimore City Deferred Loan Agreement clearly fails as both a mortgage and as an equitable mortgage.[12] We next review the Maryland Secondary Mortgage Loan Law and whether the Baltimore City Deferred Loan triggers the Secondary Mortgage Loan Law.

## C. Maryland Secondary Mortgage Loan Law

The Maryland Secondary Mortgage Loan Law[13] was enacted by 1967 Maryland Laws, Chapter 390 (Senate Bill 566). Chapter 390 stated:

AN ACT to add new Sections 39 to 70, inclusive, to Article 66 of the Annotated Code of Maryland (1964 Replacement

---

**12.** The concept of equitable mortgages is distinct from the concept of equitable subrogation in the assessing of lien priorities. For a discussion of equitable subrogation, *see generally G.E. Capital Mortgage Services, Inc. v. Levenson,* 338 Md. 227, 657 A.2d 1170 (1995).

The Court of Special Appeals held that the City Loan agreement was not a mortgage and petitioner is not contesting that holding on appeal. As discussed, *infra,* we agree with the holding of the Court of Special Appeals that the City Loan agreement is not a mortgage. The only use of the term "mortgage" was on the "blue back," which is not a part of the loan agreement with the City.

**13.** The SMLL is codified at Maryland Code (1975, 2000 Repl.Vol.), Title 12, Subtitle 4 of the Commercial Law Article. All references to any sections are to the SMLL at this cite, unless otherwise cited.

Volume), title "Mortgages," to follow immediately after Section 38 thereof, and to be under the new subtitle "Secondary Mortgage Loan Law"; to generally provide for the licensing of persons in the business of negotiating secondary mortgage loans, and to generally provide for the regulations of such persons and such loans, to give the Banking Commissioner certain duties and powers in the regulation of such persons and such loans, to provide penalties for violations and to generally relate to secondary mortgage transactions and the regulation of persons in this business.

The SMLL was later transferred to the Commercial Law Article when the Commercial Law Article was established by 1975 Maryland Laws, Chapter 49 (House Bill 26). As stated, *supra*, the SMLL is currently codified at Maryland Code (1975, 2000 Repl.Vol.), Title 12, Subtitle 4 of the Commercial Law Article.

In order for the SMLL to be applicable, a loan must be a secondary mortgage loan under section 12–401(i), which states:

(i) *Secondary mortgage loan.*—(1) "Secondary mortgage loan" means a loan or deferred purchase price secured in whole or in part by a mortgage, deed of trust, security agreement, or other lien on real property located in the State, which property:

(i) Is subject to the lien of one or more prior encumbrances, except a ground rent or other leasehold interest; and

(ii) Has a dwelling on it designed principally as a residence with accommodations for not more than four families.

If a piece of property has a lien of a prior encumbrance,[14] then the SMLL, among other restrictions, restricts the maximum

---

14. Maryland Code (1975, 2000 Repl.Vol.), section 12–401(d) of the Commercial Law Article defines a lien on real property as:

(d) *Lien on real property.*—"Lien on real property" includes:

(1) A confessed judgment note or consent judgment required by a person who ordinarily requires such an instrument for the purpose of

interest rate that can be charged, the amount of origination fee, and precludes a lender from collecting any other commission, finder's fee, or points for obtaining, procuring, or placing a loan.

Petitioner alleges in her Complaint that the City Loan was a lien of a prior encumbrance. Petitioner claims that respondents violated the SMLL by charging both an origination fee and an additional fee in violation of Maryland Code (1975, 1990 Repl.Vol.), section 12–405(a) of the Commercial Law Article. At the time of the filing of the case *sub judice*, Maryland Code (1975, 1990 Repl.Vol.), section 12–405(a) of the Commercial Law Article stated:

> (a) *Origination fee.*—(1) A lender may collect a loan origination fee not exceeding the greater of $500 or 4 percent of the net proceeds of a commercial loan of $75,000 or less made under this subtitle or not exceeding $250 or 2 percent of the net proceeds of any other loan under this subtitle. However, the lender may not collect from the borrower any other commission, finder's fee, or point for obtaining, procuring, or placing a loan.

Petitioner claims that respondents violated this section by charging a four percent origination fee when Maryland Code (1975, 1990 Repl.Vol.), section 12–405(a) of the Commercial Law Article caps the origination fee at two percent of the net proceeds.[15] Petitioner also claims that respondents violated

---

> acquiring a lien on property described in subsection (i) of this section; and
>
> (2) A sale and leaseback required by a person for that purpose.

**15.** Net proceeds is defined in section 12–401(f), which states:

> (f) *Net proceeds.*—"Net proceeds" means the difference between:
>
> (1) The full amount of a secondary mortgage loan; and
>
> (2) The amount of interest taken in advance on the loan plus the amount of the loan origination fee.

Petitioner alleges that the full amount of the bank loan was $38,500.00, minus the amount of interest taken in advance, $318.76 and the amount of the loan origination fee, $1,540.00, for a total of $36,641.24. The loan origination fee is only allowed to be two percent of $36,641.24, which is $732.82. Respondents charged petitioner a loan origination fee of $1,540.00, which is approximately four percent of the net pro-

Maryland Code (1975, 1990 Repl.Vol.), section 12–405(a) of the Commercial Law Article by charging her a $700.00 fee labeled "Loan Discount," which she feels is an additional fee or commission in violation of that section.[16]

Petitioner contends that since respondents are in violation of the SMLL, the Circuit Court should have then looked to section 12–413 for the penalty. Section 12–413 states:

### § 12–413.  Civil penalties.

Except for a bona fide error of computation, if a lender violates any provision of this subtitle he may collect only the principal amount of the loan and may not collect any interest, costs, or other charges with respect to the loan. In addition, a lender who knowingly violates any provision of this subtitle also shall forfeit to the borrower three times the amount of interest and charges collected in excess of that authorized by law.

ceeds and is $807.18 more than the allowed two percent loan origination fee if the transaction is subject to the restrictions of the SMLL.

16. The Court notes that there have been changes to section 12–405(a) since this case was filed in the Circuit Court for Baltimore City on September 29, 1997. 1998 Maryland Laws, Chapter 760 (Senate Bill 105) and 1998 Maryland Laws, Chapter 761(House Bill 202) changed section 12–405(a) to read:

(a) *Origination fee.*—(1) A lender may collect a loan origination fee for making a loan under this subtitle only as provided in this section.

(2) The aggregate amount of the loan origination fee imposed by a lender under this section when combined with any finder's fee imposed by a mortgage broker under § 12–804 of this article may not exceed the greater of:

(i) $500 or 10 percent of the net proceeds of a commercial loan of $75,000 or less made under this subtitle; or

(ii) $250 or 10 percent of the net proceeds of any other loan made under this subtitle.

(3) A lender may not collect from the borrower any other commission, finder's fee, or point for obtaining, procuring, or placing a loan under this subtitle.

Under the new section 12–405(a), the origination fee charged by respondents in this case would be under the ten percent cap stated in section 12–405(a)(2)(ii). Nevertheless, if the SMLL applied, respondents could still be in violation of section 12–405(a)(3) for the $700.00 fee that was labeled "Loan Discount."

In accordance with this section, in her Complaint, petitioner requested that respondents "may collect only the principal amount of the loan, and shall not collect interest, costs or other charges with respect to this loan." We then are called upon to interpret the loan agreement and its relationship, if any, to the type of prior encumbrance that triggers the SMLL. That essentially is a legal, not factual matter, especially given that the facts do not appear to be in dispute.

### D. Analysis of the City Loan Under the SMLL

█ In order for the Bank Loan to qualify under the SMLL, there must have been a lien constituting a qualifying prior encumbrance on the title to petitioner's property. Petitioner contends that the City Loan created an equitable lien that was a lien of a prior encumbrance. Respondents contend that the City Loan was just a loan and did not create a lien on the title to petitioner's property.

The City Loan states, in part:

WHEREAS, the *Owner is willing to subject the Property to a rehabilitation easement and to the claims of the City for the repayment of the Loan pursuant to the terms and conditions set forth in this Agreement;* and

WHEREAS, it is agreed that the repayment of the indebtedness evidenced hereby, as well as the performance of the other covenants, terms and conditions herein, should be secured by the execution of this Agreement.

. . . .

II. The Owner agrees as follows:

1) To repay the Loan and simple interest thereon at the rate of 3% per annum in the event the Property is transferred, sold, assigned or abandoned or if the Owner ceases to own the Property, whether by death, condemnation, operation of Law or otherwise. It is expressly understood and agreed by the owner that upon his or her death, his or her heirs may assume the loan and be subject to the terms and conditions of the Deferred Loan Program. . . .

. . . .

7) Upon the occurrence of any such default, NPA/DHCD [17] may take any or all of the following remedial steps:

a) NPA/DHCD may, upon notice in writing that a default has occurred under this Agreement and is continuing, stop making payments hereunder and apply the balance of the undisbursed Loan proceeds to the payment of the Loan and to pay any funds due to the contractor for completed work; and/or

b) may declare the indebtedness evidenced and secured by this Agreement immediately due and payable; and/or

c) may take whatever action at Law or in equity as may appear necessary or desirable to enforce any obligation, covenant or agreement of the Owner under this Agreement. [Emphasis added.]

Only the signature of the City's representative was attested to on the City Loan agreement.

Petitioner points to several factors that she thinks establishes that the City Loan created a lien on her property. Petitioner contends that the language in the loan agreement that "the Owner is willing to subject the Property to a rehabilitation easement and to the claim of the City for the repayment of the Loan" and petitioner's understanding that she was giving the City a lien on her property show the intent of the parties to create a lien. Petitioner also points to the City Loan agreement being recorded in Baltimore City as a mortgage as proof of the parties' intent to create a lien on petitioner's property. Petitioner contends that the totality of the facts, that the City Loan agreement was recorded, the language of the City Loan agreement, the creation of a rehabilitation easement on petitioner's property, and petitioner's understanding that she was giving the City a lien on her

---

17. NPA/DHCD is the acronym for the Neighborhood Progress Administration and the Department of Housing & Community Development.

property, all prove that the intent of the parties was to create a lien. We disagree with petitioner. We hold that the City Loan did not create an equitable lien in the property but provided the City with a chose in action.[18]

██  This Court has stated that "[t]he modern conception of a lien is that it is a right given by contract, statute or rule of law to have a debt or charge satisfied *out of a particular property.*" *Chevy Chase Bank v. Chaires,* 350 Md. 716, 731, 715 A.2d 199, 206 (1998). In *Equitable Trust Co. v. Imbesi,* 287 Md. 249, 412 A.2d 96 (1980), this Court, while examining equitable liens, quoting from *Keyworth v. Israelson,* 240 Md. 289, 214 A.2d 168 (1965), stated that:

> An equitable lien is based on specific enforcement of a contract to assign property as security. The contract need not stipulate for the lien in express terms; it is enough if that is the fair and reasonable implication of the terms employed. A mere promise to pay a debt or obligation does not of itself, however, create a lien unless the intention to create it is apparent from the instrument and circumstances leading to it. *Johnson v. Johnson,* 40 Md. 189, 196 (1874). See 33 Am.Jur. *Liens* § 18 and 4 Pomeroy's *Equity Jurisprudence* §§ 1235–1237 (5th ed.1941); but also see 41 Harv. L.Rev. 404 (1928). [*Id.* at 305, 214 A.2d 168.]

This is in accord with 4 J. Pomeroy, *Equity Jurisprudence* § 1235 (5th ed., S. Symons 1941), cited in *Keyworth,* where it is stated:

> The doctrine may be stated in its most general form, that every express executory agreement in writing, whereby the contracting party sufficiently indicates an intention to make some particular property, real or per-

---

**18.** In their Reply Brief, respondents contended that even if the City Loan created an equitable lien, the SMLL is not triggered because an equitable lien is not a lien of a prior encumbrance under the SMLL. Because we are holding that the City Loan does not create an equitable lien, we will not decide whether an equitable lien qualifies as a lien of a prior encumbrance under the SMLL.

sonal, or fund, therein described or identified, a security for a debt or other obligation, or whereby the party promises to convey or assign or transfer the property as security, creates an equitable lien upon the property so indicated, which is enforceable against the property in the hands not only of the original contractor, but of his heirs, administrators, executors, voluntary assignees, and purchasers or encumbrancers with notice. [*Id.* at 696.]

. . . .

In summary, it would appear that under our cases *for an equitable lien to exist a specific intent to create a lien must be made manifest* as, for instance, where a written instrument evidences an intent to create a lien but the instrument is imperfect in some regard, such as one with a defective acknowledgment. In the absence of a written contract construed to embody the full agreement of the parties, an equitable lien may be found only where the sum total of the circumstances of the dealings between the parties fairly may be said to evidence an intent to create such a lien. *Id.* at 256–60, 412 A.2d at 99–101 (alterations in original) (emphasis added).

In *Equitable Trust Co.*, Thomas L. Imbesi and his son borrowed $60,000.00 from The Equitable Trust Co. Mr. Imbesi signed a document titled a Covenant Not To Encumber or Convey Real Estate, in which Mr. Imbesi, as long as he was indebted to The Equitable Trust Co., would "not make, or cause to be made any deed of trust, mortgage, conveyance or any other instrument or agreement having the effect of a lien upon or conveyance of the real estate now owned by me/ us . . . ." This document was recorded among the land records of Baltimore County. Mr. Imbesi's son then borrowed money from a different bank and he secured the loan with a mortgage on the property mentioned in the covenant not to encumber. The second bank eventually entered judgment against Mr. Imbesi and a suit to foreclose under the covenant not to encumber was filed by The Equitable Trust Co. This Court had to decide whether the covenant not to encumber was an equitable lien. The Court held that a negative covenant not to

encumber or convey real property was not an equitable lien. The Court stated that:

With that background, we turn to the instrument in question. It is plain and unambiguous. It does nothing more than to recite that there is a debt to Equitable and that in consideration of that debt Imbesi will not encumber or convey specified land so long as the debt remains unpaid. It will be recalled that the Court stated in *Keyworth*, 240 Md. at 305, 214 A.2d 168, that an equitable lien is based on specific performance of a contract to assign property as security. In *Western Bank*, 91 Md. at 621, 46 A. 960, cited by Jones, the Court said relative to an equitable mortgage, "[I]n all such cases the *intent to create a mortgage* is the essential feature of the transaction." (Emphasis in original.)

We have here no homemade security instrument in which the parties labored to produce a lien of some sort but fell short of the legal requirements and thus must be rescued by a court of equity. The form on which this agreement was placed was a printed document prepared by one of the largest banks in the State. We have no instrument which purports in any way to convey or to place a lien upon land. The agreement is barren of anything to indicate an intent to create a lien. We have nothing but an agreement *not* to do a particular thing. In the words of the West Virginia court in *Knott[ v. Shepherdstown Manuf'g Co.*, 30 W.Va. 790, 5 S.E. 266 (1888) ] "[t]he creation of a lien is an affirmative act, and the intention to do such act can not be implied from an express negative." *Id.* 30 W.Va. at 796[, 5 S.E. 266]. We agree. Accordingly, we find no equitable lien. It follows as a consequence that the instrument with which we are here concerned creates no lien paramount to subsequent mortgages or judgment liens on the same property.

*Id.* at 270–71, 412 A.2d at 106–07.

In *Montgomery County v. May Department Stores Co.*, 352 Md. 183, 721 A.2d 249 (1998), a dispute arose between Montgomery County and May Department Stores over surplus proceeds from a mortgage foreclosure. May Department

Stores had a judgment lien against the property that was part of the mortgage foreclosure. The claim of Montgomery County was that covenants running with the County's Moderately Priced Dwelling Unit program [19] gave the County a lien on that property that had a priority over the lien of May Department Stores. The Court held that the covenants did not create a lien. The Court could not find any language where the residents of the dwelling units agreed to the imposition of a lien on their particular lot. The Court also held that a statutory lien was not created because there was no express language creating a lien. While the Court recognized that express language creating a lien was not an absolute prerequisite to the recognition of an equitable lien, the Court could not find any language that created an equitable lien. The Court stated that "[i]n the matter before us Article X of the Avenel MPDU covenants is even further removed from an equitable lien than was the covenant not to encumber or convey that was involved in *Equitable Trust*." *Id.* at 197, 721 A.2d at 256.

The courts of our sister states have also held that in order to create an equitable lien there must be a clear intent by the parties to establish the lien. *Warren v. Warren,* 11 Ark.App. 58, 61, 665 S.W.2d 909, 910–11 (1984) (the mere loan of money for the purchase of property does not result in an equitable lien in favor of the lender where the evidence does not show an agreement to give the lender a lien); *Leveyfilm, Inc. v. Cosmopolitan Bank & Trust,* 274 Ill.App.3d 348, 355, 210 Ill.Dec. 680, 653 N.E.2d 875, 880 (1995) ("However, we also recognize that if a contract expressly covers the entire subject matter and does not provide for a lien, a lien will not be created by implication."); *Wright v. Wright,* 311 N.W.2d 484, 485–86 (Minn.1981) ("The district court was correct in determining that this was in fact a loan, due and payable at the time of the sale of the homestead. As the sale of the homestead had not yet occurred, the loan was not due and defendant was not in default. . . . [A] loan made to enable a

---

**19.** The property that was part of the foreclosure proceeding was part of the County's Moderately Priced Dwelling Unit program.

borrower to purchase or pay for a homestead does not give the lender a right to a lien upon the homestead even if there is an oral agreement to give security thereupon."); *Bosler v. Short*, 277 Or. 697, 700, 561 P.2d 1025, 1026 (1977) ("However, if there is no such agreement and the promissor agrees only to pay the debt out of the sale of the property if the property is sold, an equitable lien is not created, either in the land or in the proceeds of the sale.") [20]; *Hoza v. Hoza*, 302 Pa.Super. 72, 79, 448 A.2d 100, 104 (1982) (to establish a right to an equitable lien, the evidence must be clear, precise and indubitable as to the intention of the parties).

Petitioner has also pointed to the fact that the City Loan agreement established a rehabilitative easement, which is an encumbrance on the property, as proof that petitioner and the City intended to establish an equitable lien. In *Manor Real Estate Co. v. Jos M. Zamoiski Co.*, 251 Md. 120, 125, 246 A.2d 240, 243 (1968), we stated that "there are many encumbrances, such as easements, that are not liens." Easements of many kinds, utility easements, right of way easements, water access easements, and now rehabilitation easements may exist and many properties are subject to them. They are not considered to be liens. Although the rehabilitation easement placed an encumbrance upon petitioner's property, it did not establish an equitable lien upon the property so as to trigger the SMLL.

Moreover, in *Chevy Chase Bank v. Chaires*, 350 Md. 716, 715 A.2d 199 (1998), a case in which we held that Shore Erosion Control Liens statutorily created by the State Legislature (not by a municipality), did constitute prior encumbrances for purposes of the SMLL, we explained why:

> "The modern conception of a lien is that it is a right given by contract, statute or rule of law to have a debt or charge

---

**20.** The Agreement in the case *sub judice* appears to be similar, a loan payable at the time of transfer of the property. The subsequent mortgage to respondents may have placed the loan from the City in default, indeed may have made it payable, however, the fact that a subsequent transfer of property places a loan in default, does not transform it into a lien against the title to real property.

satisfied out of a particular property." Here, NR § 8–1006(c) creates a statutory lien in favor of the State ("A benefit charge assessed under this subtitle shall be a lien on the real property against which the benefit charge is assessed."), not only as to an annual installment in default (which "shall be a first lien on the benefitted property, subject only to prior State, county, or municipal real property taxes") but also as to the "outstanding balance of a benefit charge [which] shall be afforded normal lien priority." Further the method for enforcing the lien is not tied to annual taxes. The State may enforce collection "in the manner specified for foreclosure of mortgages."

*Id.* at 731, 715 A.2d at 206 (internal citations omitted) (alteration in original). The thrust of our statement in *Chevy Chase* was that the *State* statute creating the Shore Erosion Control Lien, contained specific language creating lien status, and thus lien and encumbrance priorities for SMLL purposes.

In the present case there exists neither express statutory language, such as that existing in the SECL statute, nor is there any such express language in the document evidencing the loan arrangement. The mere indication of "mortgage" on the "blue back"[21] does not make the document that type of instrument that may constitute a lien or encumbrance for purposes of the SMLL. The writing on the "blue back" *is not part of the instrument;* it merely is an aid to the recorder as to where the person forwarding the document desires it to be recorded, and where it should be returned after recording. The actual document in the present case does not describe the instrument as a mortgage, nor does it describe it as a lien against the particular property, nor does it provide that upon

---

21. It may have been a brown back, grey back, or some other color of outside binding that instruments are sometimes contained within when they are recorded. Along with sometimes containing a general title, they also normally contain the names of the attorneys involved, and where the original instrument should be returned after it is recorded. "Blue back" bindings are not ordinarily considered to be part of the instruments they bind.

default it is that type of lien that can be enforced "in the manner specified for the foreclosure of mortgages."

Moreover, as we indicated subsequent to *Chevy Chase*, in *Montgomery County v. May Department Stores Co.*, 352 Md. 183, 200, 721 A.2d 249, 257 (1998), in the somewhat related context of a local government attempting, *by local statute*, to insert its claims in respect to advances of loan sums for a housing unit under a local moderately priced housing program, ahead of the priority of judgment lien holders:

> If we assume, *arguendo*, that as a matter of statutory construction, § 25A–9(e) attempted to effect a reordering of priorities between judgment lienors and the County, as a general creditor under the MPDU program, then the attempt would be invalid. Under those circumstances § 25A–9(e) would be preempted by conflict with public general statutory law, for the reasons stated by the Court of Special Appeals. *May Dep't Stores*, 118 Md.App. at 448–63, 702 A.2d at 992–99.

The Court of Special Appeals in *May Department Stores v. Montgomery County*, 118 Md.App. 441, 461, 702 A.2d 988, 998–99 (1997), found in relevant part that:

> What the County has attempted is to advance, by its ordinance, the County's possible future status as a general creditor above the status of existing judgment creditors without ever obtaining a judgment. Judgment creditors normally are created by judicial action *pursuant to State statutes* and court rules. *In the absence of State legislative action that gives Montgomery County's inchoate claims specific priority over judgment creditors, Montgomery County cannot by local ordinance give to itself a senior status, even under its general home rule powers or, specifically, its delegated authority to create a local affordable housing program.* The County cannot elevate its status above the status afforded by State law and the status afforded other judgment lien holders. [Emphasis added.]

In the case *sub judice*, we have been directed to no State statute, or for that matter to any Federal statute, nor do we

know of any, that authorizes the City of Baltimore to claim liens or encumbrances against a specific property, merely because it enters into a loan agreement with a private party, for funds for that party to use in rehabilitating the property, reserving to the City only the right to enter upon the property to see to the proper application of the loan proceeds, and the right to demand payment from the debtor, if the debtor transfers the property. Not only is there no State authorization supporting the position the City would have to take in order to validate the claims of petitioner that the loan agreement constitutes a prior lien or encumbrance against the specific property, we have been directed to no local ordinance or law (valid or otherwise), nor know of any, upon which Baltimore City might attempt to rely if it were to assert a lien priority over the mortgage held by the respondents in the present case. Under the circumstances of this case, Baltimore City, absent State statute, would not be able to assert a priority over the mortgage of respondents. That is the effect of our holding in *May Department Stores, supra.*

Even if there was a valid city statute, the actual language of the loan arrangement's repayment provisions, its right to demand repayment from the petitioner, would come into play only upon the transfer of the property by the petitioner. At that point, the City's recourse would be to proceed against the debtor on her personal promise to pay, or to, perhaps, proceed against the proceeds of sale, or of loan proceeds, to the extent such proceeds remain in the hands of the debtor or the debtor's agents. At the point that the City could, under the provisions of the City Loan agreement, demand payment, the property would already be transferred, *i.e.,* mortgaged. Thus, even if the loan agreement was sufficiently specific to qualify as a lien under State law, or under a local law if such a local law was authorized by State law, it would only qualify as a lien, if at all, in the future, at a time after the mortgage or deed of trust in the present case was recorded. Thus the mortgage from respondents in the case at bar is a first mortgage, not a secondary mortgage.

In the final analysis, petitioner has failed to prove that the parties created a lien *on petitioner's property.* Petitioner cites the "WHEREAS" language in the Baltimore City Deferred Loan Agreement, which states that "the Owner is willing to subject the Property to a rehabilitation easement and to the claim of the City for the repayment of the Loan pursuant to the terms and conditions set forth in this Agreement." This language contained only in the "WHEREAS" clauses, and not in the operative clauses of the agreement, fails to sufficiently establish a lien on the property at issue. As stated, *supra,* an easement is an encumbrance on property, but it is not a lien. The other language in the Agreement only provides the City with a claim for repayment under the conditions of the Agreement. The Agreement, itself, only provides the City with an opportunity to demand repayment if the property is sold or transferred. The City may then have a claim against the proceeds from the sale of the property, but has no claim against the property. Prior to the time of transfer, the city has no claim for repayment.

There is no language in the Agreement calling for a current lien on the property. In the operative section of the Agreement [22] that states when the Owner has to repay the loan, there is no mention of a lien on the property. In the section of the Agreement that states what can occur upon a default by the Owner, there is no mention of a lien or a security interest on petitioner's property. There is no mention of right to enforce payment by way of "foreclosure." There is little implication that the City, as the drafter of the document, and petitioner intended to create an equitable lien against petitioner's property. There is no statute, Federal, State, or local, which would serve to create a lien on behalf of the City attaching to the specific property here at issue. The clear analysis is that this was a loan that provided that the City could demand payment only after a borrower's transfer of property. It did not create a prior lien for purposes of the SMLL.

---

22. As opposed to the "WHEREAS" clauses.

## Conclusion

We hold that the Baltimore City Deferred Loan Agreement was not an equitable mortgage or lien against the subject property and therefore, was not a lien of a prior encumbrance sufficient to trigger the application of the Maryland Secondary Mortgage Loan Law to the mortgage or deed of trust of respondents. Based on the Baltimore City Deferred Loan Agreement, the City maintains a right to recover the loan amount, after the sale or transfer of the property, but the City does not maintain a security interest in petitioner's property to recover the loan amount. Based solely upon the Agreement, the City could not have proceeded directly to a judicial sale by way of a foreclosure. There was neither a consent to sale nor a power of sale contained in the Agreement. It met virtually none of the prerequisites of a mortgage. Upon default, the City's recourse would be to bring an action at law against petitioner, litigate that action to judgment, and then proceed to execute on the judgment lien against the property of petitioner. Baltimore City may have a chose in action against petitioner, not a security interest in petitioner's property.

The Circuit Court for Baltimore City erred in granting petitioner's Motion for Summary Judgment. While there is no dispute as to an issue of material fact, the Circuit Court erred as a matter of law by determining that the City Loan was a lien of a prior encumbrance that triggered the Maryland Secondary Mortgage Loan Law.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS IS AFFIRMED; COSTS TO BE PAID BY PETITIONER.**